**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

SHANNON M. PETERS,

             Plaintiff,

vs.

WOODBURY COUNTY, IOWA;
GLENN J. PARRETT, Individually and
as Sheriff of Woodbury County, Iowa; and
MICHELLE RISDAL, LEE
BLANCHARD, JONATHAN
HATFIELD, and CARLOS LUCERO,
Individually and as Deputy Sheriffs/Jailers
of Woodbury County, Iowa,

             Defendants.

No. C 12-4070-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION TO EXCLUDE EXPERT
TESTIMONY AND REPORT OF
DONALD LEACH, II, AND
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

I.     **INTRODUCTION**................................................................................**4**
     A.    *Factual Background For Summary Judgment*................................ **4**
          1.    *Peters's arrest and booking*.................................................. **6**
          2.    *Events upon arrival at the holding cell*.............................. **7**
          3.    *Escalation of the incident in the holding cell*....................... **8**
          4.    *Subsequent events*...................................................... **10**
     B.    *Factual Background For The Motion To Exclude Expert*
          *Evidence*.............................................................................. **13**
     C.    *Procedural Background*........................................................ **16**
          1.    *Peters's claims*...................................................... **16**
          2.    *The pending motions*................................................ **17**

II.   **PETERS'S MOTION TO EXCLUDE EXPERT TESTIMONY
     AND TO STRIKE EXPERT REPORT**.................................................. **18**
     A.    *Arguments Of The Parties*.................................................... **18**
     B.    *Analysis*........................................................................**20**

|  |  | 1. | Applicable standards | 20 |
|  |  | 2. | Application of the standards | 23 |
|  |  |  | a. Peters's "reliability" challenge | 23 |
|  |  |  | b. Peters's "relevancy" challenge | 24 |
|  | C. | Summary |  | 32 |
| III. | **THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |  |  | 33 |
|  | A. | Summary Judgment Standards |  | 33 |
|  | B. | Challenges Based On Qualified Immunity |  | 34 |
|  |  | 1. | Standards for qualified immunity | 34 |
|  |  | 2. | The "violation of privacy rights" claim | 39 |
|  |  |  | a. Source of the right | 40 |
|  |  |  | i. Arguments of the parties | 40 |
|  |  |  | ii. Analysis | 41 |
|  |  |  | b. Nature of the conduct | 43 |
|  |  |  | i. Arguments of the parties | 43 |
|  |  |  | ii. Analysis | 44 |
|  |  |  | iii. Summary | 58 |
|  |  |  | c. Violation of the right | 58 |
|  |  |  | i. Arguments of the parties | 58 |
|  |  |  | ii. Analysis | 61 |
|  |  |  | iii. Summary | 66 |
|  |  |  | d. "Clearly established" right | 67 |
|  |  |  | i. Arguments of the parties | 67 |
|  |  |  | ii. Analysis | 68 |
|  |  |  | e. Summary | 73 |
|  |  | 3. | The "excessive force" claim | 73 |
|  |  |  | a. Source of the right | 73 |
|  |  |  | b. Violation of the right | 75 |
|  |  |  | i. Arguments of the parties | 75 |
|  |  |  | ii. Analysis | 77 |
|  |  |  | iii. Summary | 98 |
|  |  |  | c. "Clearly established" right | 99 |
|  |  |  | i. Arguments of the parties | 99 |
|  |  |  | ii. Analysis | 100 |
|  |  |  | d. Summary | 101 |
|  |  | 4. | The "First Amendment retaliation" claim | 102 |
|  |  |  | a. Arguments of the parties | 103 |
|  |  |  | b. Analysis | 105 |

        *c.*     *Summary*.............................................................*112*
  **C.**    **Challenges To Claims Based On The Iowa Constitution**.................*113*
      **1.**    **Arguments of the parties**..............................................*113*
      **2.**    **Analysis** ..................................................................*114*
  **D.**    **Challenges To "Monell Liability"**...........................................*115*
      **1.**    **Arguments of the parties**..............................................*115*
      **2.**    **Analysis** ..................................................................*116*

**IV.**   **CONCLUSION**............................................................................*118*

Did male and female county jail officers cross a constitutional line when they forcibly removed clothing from a female arrested for a misdemeanor offense who refused to answer "suicide" questions during booking and refused to change into a jail uniform in front of a female officer? In this action pursuant to 42 U.S.C. § 1983, the female arrestee asserts that the defendant jail officers "strip searched" her without reasonable suspicion and in an unconstitutional manner, used "excessive force" in doing so, and did so in retaliation for her vociferous complaints about the order to strip in front of a female officer, all in violation of the United States and Iowa Constitutions. She also contends that the defendant county and the defendant former county sheriff are subject to "*Monell* liability" for the jail officers' constitutional torts. The defendants have moved for summary judgment on the plaintiff's claims, primarily on the ground that the defendant jail officers are entitled to qualified immunity, but also on the ground that there is no cause of action for a violation of

rights under the Iowa Constitution and that there is no basis for "*Monell* liability" of the county and the former county sheriff. As a preliminary matter, the plaintiff seeks to exclude the testimony and report of the defendants' expert, because she argues that the expert has applied the wrong legal standard to her "excessive force" claim and has opined on legal conclusions that are within the province of the court. Although I find that the pending motions present some knotty issues, I conclude that the appropriate disposition of these motions is clear.

## I.    INTRODUCTION

### A.    *Factual Background For Summary Judgment*

My determination of what facts are actually disputed in this case—and then whether those disputes are genuine—has been complicated by the parties' submissions and, sometimes, by the lack thereof. In the first instance, the factual background stated here is drawn primarily from the defendants' Joint Statement Of Undisputed Material Facts In Support Of Their Motions For Summary Judgment (docket no. 42-1) and the plaintiff's Response To Defendants' Joint Statement Of Undisputed Facts In Support Of Their Motions For Summary Judgment (docket no. 53-3). The plaintiff did not submit a statement of additional material facts that she contends preclude summary judgment, however, as required by N.D. IA. L.R. 56(b)(3). Even so, the parties apparently agree that the defendants' Joint Statement Of Undisputed Material Facts and the plaintiff's Response are not exhaustive of factual issues material to the defendants' Motions For Summary Judgment, because both the defendants and the plaintiff repeatedly recite and rely on additional facts in their briefs, both with and without adequate citations to the parties' appendices or other portions of the record. A further problem here is that the plaintiff has failed to respond to several of the defendants' individual statements of material facts by expressly admitting or denying them, and she has sometimes made

what appear to be denials without any references or only imprecise references to parts of the record supporting her refusal to admit the stated facts, contrary to the requirements of N.D. I_A. L.R. 56(b). Thus, some of the facts are deemed undisputed because of the plaintiff's failure to respond appropriately to the defendants' pertinent statements of undisputed facts. *See* N.D. I_A. L.R. 56(b).[1]

---

[1] Pursuant to N.D. I_A. L.R. 56(b), a resistance to a motion for summary judgment requires, *inter alia*, "[a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact" and further specifies that "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." The plaintiff has failed to comply with these requirements in several instances.

One of many examples is the plaintiff's response to the defendants' statement of the following purportedly undisputed facts:

> 19. [Plaintiff] Peters continued to resist and attempted to disobey the officers' directions. App. 9, 11, 12. [Sergeant] Blanchard applied a Mandibular Angle control measure with his right thumb below [Peters's] left ear. App. 9.

Defendants' Joint Statement Of Undisputed Material Facts, ¶ 19. Peters responded to this individual statement of facts as follows:

> 19. It is admitted that Peters was beaten including her face.

Plaintiff's Response To Defendants' Joint Statement Of Undisputed Facts, ¶ 19. The facts by the defendants in ¶ 19 plainly were not that Peters "was beaten," so that the

(Footnote continued . . . )

Thus, unless otherwise indicated, the facts stated below are from the defendants' Joint Statement Of Undisputed Material Facts, and the plaintiff has expressly admitted them.

### 1. *Peters's arrest and booking*

Sioux City police officers arrested plaintiff Shannon Peters on May 27, 2012, for violation of a no contact order. The defendants elsewhere assert, and Peters does not dispute, that she was arrested after police stopped a speeding car, in which Peters's boyfriend, against whom she had obtained a no contact order, was the driver and Peters was a passenger. Peters elsewhere asserts, and told the Defendant Officers at the time of her booking, that she believed that the no contact order had been dropped, but she now admits that she was mistaken. Peters was taken to the Woodbury County Jail, and, upon arrival there, she was taken to the booking counter, where defendant Officer Michelle Risdal and defendant Officer Jon Hatfield were already present. Peters was

---

plaintiff's admission of a fact not stated, particularly with no citation to any supporting portion of the record, cannot be deemed a "qualification," but is simply not responsive.

Pursuant to N.D. IA. L.R. 56(b), "[t]he failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." Thus, for example, in this specific instance, I deem the plaintiff to have admitted that she continued to resist and attempted to disobey the officers' directions and that Sergeant Blanchard applied a mandibular angle control measure with his right thumb below the plaintiff's left ear, because the plaintiff did not expressly admit, deny, or qualify those factual statements and provided no citation to the record in support of her purported response. I will indicate where I have deemed other factual statements admitted by the plaintiff's failure to respond to them appropriately.

crying while she was at the counter.[2]  At the time that she arrived at the jail, Peters was wearing a swimsuit under her shirt and sweat pants.

Citing a video of Peters's booking, the defendants contend that, while at the booking counter, after several minutes of sobbing, Peters suddenly became agitated and upset and repeatedly shouted, "This is bullshit" at the officers, then refused to answer all of the booking questions, including the medical and "suicide" questions.  Peters denies these allegations, citing the same video.  Sergeant Lee Blanchard came into the booking area and directed the officers to terminate the booking process prior to completion.[3]  Officer Risdal, the only female officer present, escorted Peters to a holding cell, and two male officers, Officer Hatfield and Sergeant Blanchard, followed.

### 2.    *Events upon arrival at the holding cell*

Officer Risdal and Peters entered a holding cell, but Officer Hatfield remained outside in the hallway.  The parties agree that Sergeant Blanchard was also in the hallway, but dispute whether he could see into the holding cell and whether or not there was "screaming" at that point.  The defendants assert that Sergeant Blanchard went to the doorway of the cell and asked Officer Risdal if Peters had answered the "suicide" questions, and Officer Risdal then repeated three "suicide" questions.  The defendants assert that Peters refused to answer and, instead, turned to Officer Risdal and yelled,

---

[2] Peters's response to the defendants' statement of this fact is that "at times [she] was tearful," which appears to be a qualification, but she provides no citation to the record to support her response.  Thus, the defendants' statement of this fact is deemed admitted.  *See* N.D. IA. L.R. 56(b).

[3] Peters admits, without citation to the record, the different fact that "Blanchard said to take Peters to temporary holding," so that the defendants' statement of this fact is deemed admitted.  *See* N.D. IA. L.R. 56(b).

"Why the fuck would I wanna hurt myself!" Peters admits only that she responded, "Why the fuck would I want to hurt myself," but denies the rest of these facts, apparently including the defendants' allegation of the question that prompted this response. Unfortunately, the video of the hallway to the holding cells, on which both parties in part rely, does not show the inside of the holding cell in which Peters was placed, so that it does not allow me to determine beyond dispute precisely what happened, and the audio on the recording does not allow me to determine beyond dispute precisely what was said during this exchange.

In the holding cell, Officer Risdal explained to Peters that Peters would have to take off her swimsuit. In her deposition, Officer Risdal explained that she directed Peters to do so, because the swimsuit had strings on it that Peters could use to harm herself. At this point, Sergeant Blanchard left the cell and joined Officer Hatfield in the hallway, so that the only officer in the cell with Peters was a female officer, Officer Risdal. Peters refused to remove her clothing.[4]

### 3.  *Escalation of the incident in the holding cell*

Peters continued to scream at Officer Risdal and to refuse to remove her clothing, and when Sergeant Blanchard looked back into the cell, he saw Peters standing facing Officer Risdal in what he considered an aggressive manner.[5]  Sergeant

---

[4] Because Peters admits that "Risdal Blanchard [sic] was in the cell or where he could watch during all but a few seconds," a fact not asserted by the defendants, and fails to respond to the remainder of the defendants' factual allegations in this paragraph, all of these facts are deemed admitted. *See* N.D. IA. L.R. 56(b).

[5] Peters "admit[s] that Peters refused an unlawful order to strip naked," but this "admission" does not admit or deny any fact actually asserted by the defendants in this individual statement of fact, where, for example, the defendants did not assert that Officer Risdal's order was either lawful or unlawful, and Peters's assertion that it was

(Footnote continued . . . )

Blanchard and Officer Hatfield then reentered the cell, and Sergeant Blanchard instructed Peters to stop screaming and to follow Officer Risdal's instructions.[6] Peters screamed at Sergeant Blanchard, "Don't you get in my face!"[7] Blanchard took Peters's right hand and turned it away from him, pushing or resulting in Peters falling face down onto two mattresses on the bunk in the holding cell. There is no dispute that Peters remained face down on the bunk thereafter. Officers Risdal and Hatfield then helped to restrain Peters in order to get her under control, and defendant Officer Carlos Lucero, who had entered the cell when he saw Sergeant Blanchard and Officer Hatfield quickly reenter the cell, also assisted in restraining Peters.[8]

---

"unlawful" is a legal conclusion. Thus, the defendants' factual allegation in this sentence is deemed admitted. *See* N.D. IA. L.R. 56(b).

[6] Peters's response "admit[ting] that Blanchard and Hatfield also insisted unlawfully that Peters strip naked in front of them and that Peters refused," is, again, unresponsive, so that the defendants' factual allegation in this sentence is deemed admitted. *See* N.D. IA. L.R. 56(b).

[7] Peters offers no citation to the record in support of her response "admit[ing] that Peters adamantly told all those present she was not stripping naked in front of them and that Blanchard should not get in her face," but that response admits the factual allegation actually made by the defendants.

[8] Peters states that the defendants' factual allegations in the preceding two sentences are "Denied," but the precise extent of her denial is unclear, because she cites only edited excerpts of written reports by Officer Hatfield and Sergeant Blanchard. The excerpt of Officer Hatfield's report, as purportedly quoted by Peters, with brackets enclosing language omitted by Peters, is as follows: "[Sergeant] Blanchard [then grabbed her right wrist getting control of her by twisting and] forced her face down [on the two mats that were on the bunk]." Defendants' Appendix at 10-11. The excerpt of Sergeant Blanchard's written report, as purportedly quoted by Peters, with brackets enclosing language omitted by Peters, is as follows: "I held that

(Footnote continued . . . )

The parties apparently agree that an officer brought a paper jumpsuit to the cell and placed it over Peters, but they dispute whether the paper jumpsuit covered Peters from approximately mid-back to behind her knees and covered her private areas "entirely," as the defendants allege, or whether it failed to cover Peters "in any significant way," as Peters alleges. They agree that Peters's clothes, consisting of her top, swimsuit top, sweat pants, and swimsuit bottoms, were then removed by Officer Risdal. Peters continued to resist and to attempt to disobey the officers' directions, and Sergeant Blanchard applied a mandibular angle control measure with his right thumb below Peters's left ear.[9] After Officer Risdal had removed Peters's clothing and had ensured that all of the strings were removed, Sergeant Blanchard continued to restrain Peters in order to allow the other officers to exit the cell. Sergeant Blanchard was then able to back out of the cell, and Peters was left in the cell with a paper jumpsuit.

### 4.    *Subsequent events*

Booking photos of Peters were taken the next day, May 28, 2012, at 9:38 a.m. The parties dispute—in their briefs—whether or not those photos show any injuries to Peters resulting from the incident in the holding cell.

---

hand while pushing her back onto the bunk [of the cell. She fell on the bunk which had two mattresses on it. Officers' [sic] Risdal and Hatfield then assisted in trying to gain control of her. Within a couple seconds she was held secure on the bunk] face down." Defendants' Appendix at 8. Such selective quotation is not only misleading, but too vague to explain Peters's denial of the defendants' factual statement. Thus, the defendants' factual statement is deemed admitted. *See* N.D. IA. L.R. 56(b).

[9] The inadequacy of Peters's response to this statement of fact was detailed *supra*, in note 1. In light of those inadequacies, this statement of fact is deemed admitted. *See* N.D. IA. L.R. 56(b).

Peters pleaded guilty to the charge of violating the no contact order and was sentenced to seven days in jail. The parties agree that Peters applied to serve her sentence by electronic monitoring, and the defendants assert that she was initially approved. Peters denies that she was ever approved, but cites in support of this contention only the Woodbury County Sheriff's Office's criteria for offender qualification for and removal or revocation from the electronic monitoring program, without identifying which specific criteria purportedly demonstrate that she was never approved.

The defendants contend that, prior to Peters serving her sentence, but after she was accepted to the electronic monitoring program, she failed a urinalysis drug test by testing positive for marijuana. Peters admits that she failed a urinalysis test, but contends that is why she was not approved for electronic monitoring, because approval comes after, not before, the drug test. Again, she cites the procedures established by the Woodbury County Sheriff's Office for the electronic monitoring program, but does not cite any specific provisions of those procedures establishing that approval comes only after a drug test.[10]

The defendants assert, and Peters admits, that an offender removed from the electronic monitoring program is ineligible for "good time" credit, but Peters asserts

---

[10] In fact, neither the offender qualification criteria, *see* Defendants' Appendix at 34, nor the application procedures for sentenced offenders, *see id.* at 36, requires a drug test *prior to approval* for participation in the program. On the other hand, the offender participation procedures do state that the offender must agree to random home visits to verify, either by portable alcohol testing equipment, field testing drug equipment, or other means determined by electronic monitoring staff, that the offender is not consuming alcohol or drugs, *see id.* at 38-39, and the procedures for *removal* of an offender from the program authorize removal of an offender from the program, *inter ali*a, for any consumption of controlled substances. *Id.* at 42.

that her 7-day sentence was not "doubled," as required, if she had been approved for the electronic monitoring program. The defendants assert that Peters was revoked from the program, so that she was not eligible for "good time" credit. They also assert that, although Peters was told that she would be given "good time" credit—because a correctional officer, Levi Harry, who is not a defendant, made an error in entering her information into the computer—after the mistake was discovered, Officer Harry explained to Peters why she would not be receiving "good time" credit and documented their discussion with a handwritten note about Peters's release date signed by Peters. Although Peters disputes the facts stated in the preceding two sentences, she cites only generally reports from November 11, 2012, by various officers apparently concerning inquiries by her or on her behalf about her release date, with no citation to any specific statements in any report contradicting the defendants' factual allegations.

The defendants allege that none of the Defendant Officers had any involvement with the decision to deny Peters "good time" credit. They also allege that, on November 11, 2012, Sergeant Blanchard was working at the jail, where Peters was serving her sentence, and that Peters asked to speak with him about why she was not being given "good time" credit. They allege that Sergeant Blanchard had not been involved with this issue prior to that time, so that he called his superior for background information, and it was then that Sergeant Blanchard first learned that Peters had been denied "good time" credit for failing her drug test, which he then discussed with Peters. Peters denies the allegations in this paragraph, but, again, she cites only generally reports from November 11, 2012, by various officers, without citation to any specific statements in any report contradicting the defendants' factual allegations.

### B.     Factual Background For The Motion To Exclude
### Expert Evidence

As explained, below, Peters seeks to exclude expert testimony and to strike the expert report of defendants' expert, Donald Leach II.  Peters did not submit with her motion challenging the expert's evidence a copy of the challenged expert's report, even though she refers to it as her "Exhibit 1."  She also cites to portions of the depositions of various parties and witnesses, but did not attach any of those deposition excerpts to her motion, and I ordinarily would not have access to them.  In response to Peters's motion challenging their expert, however, the defendants provided an appendix including the challenged expert's report, the plaintiff's expert's report, various deposition excerpts, and some other documents.

For purposes of providing the factual background to Peters's challenge to the defendants' expert, it is sufficient to quote certain portions of Mr. Leach's expert report.  Mr. Leach states the following concerning "use of force issues," in Section X of his report, entitled "Comments And Basis For Opinion":

> I relied on my training and knowledge as a correctional administrator regarding the use of force as presented by the U.S. Supreme Court in *Hudson v. McMillian* (1992) and further recently reinforced in *Wilkins v. Gaddy* (2010) in evaluating circumstances involving the use of force.  The attempt is to determine whether the use of force was "wanton and unnecessary" or "applied in good faith effort" to enforce facility rules and regulations.  The five elements I use to make this determination, and as described by Mr. Collins in his Guide [are]:
>
> 1.     What was the need for the use of force?
>
> 2.     What was the threat reasonably perceived by the officers?
>
> 3.     How much force was used in relation to the need?

> 4. What efforts were made to temper the use of force?
>
> 5. What injuries did the inmate sustain?
>
> This "need" includes a legitimate governmental interest in compelling the inmate to follow rules, regulations and reasonable officer directives. The failure to comply with an officer['s] directives can reasonably form the basis for the escalation in the use of force from officer directives to some form of physical control.

County Defendants' Appendix In Support Of Their Resistance To Plaintiff's Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach II (Defendants' Appendix Regarding Expert) (docket no. 48-2), 98-99 (Leach Expert Report, 17-18) (footnotes omitted).

Although Mr. Leach referred to a "wanton and unnecessary" standard as the basis for his opinion on "use of force" issues, he summarized his opinion on the "use of force" issue in the following terms:

> 2. The force used in conducting the search of Ms. Peters was reasonable and necessary given Ms. Peters' refusal to comply with the Deputies' directives, becoming physically threatening and resistive, and the legitimate governmental interest in removing her clothing for her protection from potential self harming behaviors. This is a routine and acceptable correctional practice in jails.

Defendants' Appendix Regarding Expert at 95 (Leach Expert Report at 14).

In Section XI ("Analysis"), subsection B ("Use of Force on Ms. Peters") of his report, Mr. Leach offered various more specific opinions, none of which refer to a "wanton and unnecessary" standard. First, he opined that "Ms. Peters' refusal to comply with officer directives coupled with her defiant and physically threatening behavior resulted in the officers needing to use of [sic] force to effect compliance." *Id.*

at 111 (Leach Expert Report at 30). Next, he opined that "[i]t was reasonable given Ms. Peters['] prior behaviors for Sergeant Blanchard to perceive Ms. Peters' [sic] to be physically threatening him." *Id.* at 112 (Leach Expert Report at 31). He also opined,

> The officers used sufficient force to maintain control of Ms. Peters once she was down on the bunk. The officers['] use of force was pinning her to the bunk while her clothing was removed after she refused to comply with earlier instructions allowing her to remove the clothing without officer intervention.

Defendants' Appendix Regarding Expert at 113 (Leach Expert Report at 32). Mr. Leach opined, further,

> Ms. Peters responded by to [sic] Officer Risdal by repeatedly refusing to follow her directives. The attempts by the officers were reasonable. The attempts to calm her were met with resistance and verbal abuse. The officers had a legitimate government[al] interest in enforcing their directives in the face of Ms. Peters['] continued non-compliance and aggressive behaviors.

Defendants' Appendix Regarding Expert at 114 (Leach Expert Report at 33). After concluding that there was no indication that Peters sustained injuries requiring medical care, *id.* at 114-15 (Leach Expert Report at 33-34), Mr. Leach offered the following conclusion:

> The use of force was reasonable and acceptable in light of Ms. Peters' refusal to follow the officers's [sic] directives and her threatening actions toward staff members.

Defendants' Appendix Regarding Expert at 115 (Leach Expert Report at 34).

Finally, in Section XII ("Report Conclusion"), Mr. Leach opined, in pertinent part, as follows:

> The Woodbury County Sheriff's Office had a legitimate governmental interest in obtaining information from newly arrested individuals regarding their propensity

for demonstrating self harming behaviors. The refusal of Ms. Shannon Peters to respond to queries regarding self harming behaviors justified the removal from her of potential instruments of self harm. Ms. Peters['] subsequent refusal to follow the directives of the staff in removing her clothing and donning jail attire, coupled with her physically threatening and belligerent behavior, developed the exigent circumstances that resulted in the reasonable and acceptable use of force in enforcing facility rules, regulations and officer directives.

Defendants' Appendix Regarding Expert at 124 (Leach Expert Report at 43).


### C.    Procedural Background

#### 1.    Peters's claims

Peters filed a Complaint (docket no. 2) initiating this action on July 17, 2012. The current version of her claims, however, is in her Amended Complaint (docket no. 20), filed December 20, 2012. In her Amended Complaint, Peters named Woodbury County and Glenn J. Parrett, then-Sheriff of Woodbury County, in his individual and official capacities (the County Defendants), as well as Deputy Sheriffs/Jailers Michelle Risdal, Lee Blanchard, Jonathon Hatfield, Carlos Lucero, Andrew Vogt, and Zachary Lux, in their individual and official capacities (the Defendant Officers).

In Count I of her Amended Complaint, Peters alleges an unreasonable "strip search," in violation of the Fourth Amendment to the United States Constitution and Article I, section 8, of the Iowa Constitution, against all defendants. In Count II, she alleges violation of her right to freedom of speech and her right to petition the government guaranteed by the First Amendment to the United States Constitution and Article I, section 7, of the Iowa Constitution against all defendants. In Count III, she alleges use of "excessive force" in violation of the Fourth Amendment to the United States Constitution and Article I, section 8, of the Iowa Constitution against all

defendants. Finally, in Count IV, she alleges an "unreasonable search" of her cell phone and purse in violation of the Fourth Amendment to the United States Constitution and Article I, section 8, of the Iowa Constitution against the County Defendants. The County Defendants and the Defendant Officers filed separate Answers (docket nos. 21 and 22) to Peters's Amended Complaint on December 28, 2012, and the County Defendants filed an Amended Answer (docket no. 27) on March 18, 2013.

On May 6, 2013, the parties filed a Stipulation For Dismissal Of Defendants Zachary Lux and Andrew Vogt (docket no. 30), and on June 17, 2013, the parties filed a Stipulation Of Dismissal Of Count IV Of plaintiff's Amended Complaint (docket no. 37). Thus, those defendants and that count are no longer involved in this action.

### 2.    *The pending motions*

As to pertinent procedural matters here, on July 1, 2013, Peters filed her Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II (Motion To Exclude Expert) (docket no. 39). The County Defendants filed a Resistance (docket no. 48) to the Motion To Exclude Expert on July 15, 2013, and the Defendant Officers filed a Joinder (docket no. 49) in the County Defendants' Resistance that same day.

On July 8, 2013, the Defendant Officers and the County Defendants filed separate, but nearly identical Motions For Summary Judgment (docket nos. 42 and 44), both raising issues of qualified immunity. The only significant difference between the two motions was that the County Defendants added challenges to claims against them based on "*Monell* liability." Peters filed her Combined Resistance To Motion For Summary Judgment By [The Defendant Officers] and Motion For Summary Judgment By [The County Defendants] (docket no. 53) on August 30, 2013. On September 16, 2013, the Defendant Officers and the County Defendants filed separate Replies (docket nos. 59 and 60). In their Reply, the County Defendants joined in the Defendant Officers' Reply, adding only their own reply arguments concerning "*Monell* liability."

The defendants requested oral arguments on their Motions For Summary Judgment, but Peters did not request oral arguments on her Motion To Exclude Expert Testimony. I have found the parties' written submissions on all three motions sufficient to address the issues raised. Moreover, my crowded schedule has not permitted the timely scheduling of oral arguments. Therefore, I have resolved the pending motions on the parties' written submissions.

## II.    PETERS'S MOTION TO EXCLUDE EXPERT TESTIMONY AND TO STRIKE EXPERT REPORT

In her Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II (docket no. 39), Peters asserts that Mr. Leach's opinions regarding her "excessive force" claim fail to meet the minimum admissibility requirements of Rule 702 of the Federal Rules of Evidence, because they rely on the incorrect legal standard and constitute inadmissible legal conclusions. I will take up this motion first, because it pertains to the proper record in the case, even though a ruling on any part of the defendants' Motions For Summary Judgment ultimately may not turn on the admissibility of the challenged expert's opinions. My analysis of this motion begins with a summary of the parties' arguments.

### A.    Arguments Of The Parties

Peters argues that Mr. Leach has opined that Eighth Amendment principles, and, more specifically, the Eighth Amendment "wanton and unnecessary" standard, governs her "excessive force" claim. She notes that both of the cases from which Mr. Leach extracts this standard involved use of force against convicted prisoners, which is governed by an Eighth Amendment standard, not use of force against arrestees or pretrial detainees, like her. She contends that it is not certain under Eighth Circuit

18

precedent whether a Fourth Amendment "objectively reasonable" standard or a Fourteenth Amendment "shocks the conscience" standard applies to the use of force against her, where she argues that she was "in transition" from arrestee to pretrial detainee at the time that force was used against her. Whatever standard is applicable, however, she argues that it is not the Eighth Amendment standard applied by Mr. Leach. Thus, she argues, Mr. Leach's opinions concerning use of force are fundamentally unsupported and are not admissible pursuant to Rule 702. She also asserts that, even if Mr. Leach applied the proper legal standard, he improperly states inadmissible legal conclusions, because he opines as to the ultimate liability question of whether the Defendant Officers' use of force was "reasonable." She contends that legal conclusions and instructions on the applicable law are for the court.

In response, the defendants argue that Mr. Leach's opinions are admissible under Rule 702. They argue that Mr. Leach's opinions, in this case focus, on the Defendant Officers' directives to Peters to remove her clothing and don jail attire and the force employed by the Defendant Officers when Peters refused to comply with those directives. They assert that Mr. Leach's opinions address whether these activities comport with reasonable, necessary, routine, and acceptable correctional practices in jails, based, in large part, on his training and expertise as a correctional administrator and instructor. They argue that courts have held that such expert opinions about institutional practices and standards are admissible. They represent that they do not intend to proffer expert testimony from Mr. Leach as to the legal analysis to be employed in assessing the Defendant Officers' conduct, even though they contend that Peters's expert will purportedly testify that Peters's right to be free of an unreasonable

search and seizure was violated.[11]  The defendants also argue that Mr. Leach will provide helpful information to the jurors by discussing what are routine, reasonable, necessary, and acceptable correctional practices in jails and whether the defendants' conduct and policies comport with those acceptable correctional practices.  The defendants argue that, just because one aspect of Mr. Leach's proffered testimony might be inadmissible—such as what constitutional standards are applicable and whether the Defendant Officers acted reasonably—his testimony should not be excluded in its entirety.  Indeed, they assert that Peters's challenges are more properly raised in a motion in limine than in a motion to strike.

### B.  Analysis

#### 1.  Applicable standards

A district judge's decision to exclude or allow expert testimony is reviewed for abuse of discretion.  *See United States v. Schwarck*, 719 F.3d 921, 923-24 (8th Cir. 2013) (stating the "abuse of discretion" standard of review for allowing expert testimony); *Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012) (stating the "abuse of discretion" standard of review for "[d]ecisions concerning the admission of expert testimony"); *United States v. Chaika*, 695 F.3d 741, 746 (8th Cir. 2012) ("We review this issue [of the admissibility of expert testimony] for abuse of discretion, according 'substantial deference' to the district court's decision to admit expert testimony." (citing *United States v. Roach*, 644 F.3d 763, 763–64 (8th Cir. 2011)).

---

[11] The defendants also argue that Peters's expert, Mr. Lofgreen, has offered numerous improper opinions in his report, some based on what Mr. Lofgreen opines the facts to be.  I will not repeat those arguments, because the defendants have not moved at this time to exclude any part of Mr. Lofgreen's testimony or report.

"The proponent of the expert testimony bears the burden to prove its admissibility."
*Menz v. New Holland North America, Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007) (citing
*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)).

Rule 702 provides,

> A witness who is qualified as an expert by
> knowledge, skill, experience, training, or education may
> testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles
> and methods; and
>
> **(d)** the expert has reliably applied the principles and
> methods to the facts of the case.

FED. R. EVID. 702. In short, '"[u]nder the Rules the trial judge must ensure that any
and all scientific testimony or evidence admitted is not only relevant, but reliable.'"
*Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009) (quoting *Daubert v.
Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To do so, courts apply a
three-part test when screening expert testimony, that is, "evidence based on scientific,
technical, or other specialized knowledge": (1) the evidence must be useful or helpful
to the finder of fact in deciding an ultimate issue of fact, which is "the basic rule of
relevancy"; (2) the expert must be qualified to assist the finder of fact, a "reliability"
rule; and (3) the expert's evidence "must be reliable or trustworthy in an evidentiary
sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder
of fact requires." *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (internal
quotation marks and citations omitted).

In *Lee v. Andersen*, 616 F.3d 803 (8th Cir. 2010), an "excessive force" case, the Eighth Circuit Court of Appeals explained the scope of permissible expert opinions under the "relevancy" requirement, as follows:

> Federal Rule of Evidence 702 permits a qualified expert to give opinion testimony if the expert's specialized knowledge would allow the jury to better understand the evidence or decide a fact in issue. *United States v. Arenal*, 768 F.2d 263, 269 (8th Cir.1985). "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight [ex rel. Ludwig v. Johnson Controls, Inc.]*, 36 F.3d [1396,] 1408 [(8th Cir. 1994)].

*Lee*, 616 F.3d at 808. As to "reliability," the Eighth Circuit Court of Appeals has explained that an expert's testimony may be excluded if it is "'so fundamentally unsupported that it can offer no assistance to the jury.'" *Polski*, 538 F.3d at 839 (quoting *Wood v. Minnesota Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997)).

Rule 704(a) of the Federal Rules of Evidence, concerning "opinion on an ultimate issue," adds another wrinkle to the "helpfulness/relevancy" analysis. That rule provides as follows:

> **(a) In General—Not Automatically Objectionable.**
> An opinion is not objectionable just because it embraces an ultimate issue.

FED. R. EVID. 704(a). As the Eighth Circuit Court of Appeals has explained,

> Rule 704(a) provides that expert evidence is not inadmissible because it embraces an ultimate issue to be decided by the jury. If the subject matter is within the jury's knowledge or experience, however, the expert testimony remains subject to exclusion "because the testimony does not then meet the helpfulness criterion of Rule 702." *Arenal*, 768 F.2d at 269. Opinions that "merely tell the jury what result to reach" are not admissible. Fed.R.Evid. 704 advisory committee's note.

*Lee v. Andersen*, 616 F.3d 803, 808-09 (8th Cir. 2010); *United States v. Witted*, 11 F.3d 782, 785 (8th Cir. 1993) (noting that, although Rule 704(a) allows expert testimony that "embraces an ultimate issue to be decided by the trier of fact," it does not allow "[o]pinions that are 'phrased in terms of inadequately explored legal criteria' or that 'merely tell the jury what result to reach'" (quoting FED. R. EVID. 704, advisory committee's note)).

### 2.  *Application of the standards*

#### a.  *Peters's "reliability" challenge*

Peters's first challenge to Mr. Leach's expert testimony is a "reliability" challenge, based on her assertion that Mr. Leach's testimony is wholly unreliable, because it is legally unsupported.  Peters contends that this is so, because Mr. Leach purportedly stated the wrong standard for "excessive force" claims in a case involving an arrestee or a pretrial detainee.

As noted above, an expert's testimony may be excluded on "reliability" grounds if it is "'so fundamentally unsupported that it can offer no assistance to the jury.'"  *Polski*, 538 F.3d at 839 (quoting *Wood*, 112 F.3d at 309).  Whatever standard is applicable here, Mr. Leach's reference to an Eighth Amendment "wanton and unnecessary" standard is wrong, because that standard applies to an "excessive force" claim by a convicted prisoner, but does not apply to an "excessive force" claim by either an arrestee or pretrial detainee, like Peters.  *Compare, e.g., Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013) (reiterating its holding in *Johnson v. Bi-State Justice Center/Arkansas Dep't of Corrections*, 12 F.3d 133, 136 (8th Cir. 1993), that application of a Fourth Amendment legal standard, instead of an Eighth Amendment standard—asking whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and thus, involved "unnecessary and wanton infliction of pain"—to a convicted state prisoner's "excessive

force" claim was reversible error); *United States v. Miller*, 477 F.3d 644, 647-48 (8th Cir. 2007) (stating the same standard for a convicted prisoner's "excessive force" claim); *with, e.g, LaCross v. City of Duluth*, 713 F.3d 1155, 1158 (8th Cir. 2013) (reiterating that the appropriate inquiry for an arrestee's "excessive force" claim is under the Fourth Amendment, and asks "whether the force used to effect a particular seizure is 'reasonable'" (internal quotations and citations omitted); *Montoya v. City of Flandreau*, 669 F.3d 867, 870-71 (8th Cir. 2012) (stating that the test for an arrestee's "excessive force" claim is the "reasonableness" standard under the Fourth Amendment); *Hicks v. Norwood*, 640 F.3d 839, 942 (8th Cir. 2011) ("It is settled in this circuit that the Fourth Amendment's 'objective reasonableness' standard for arrestees governs excessive-force claims arising during the booking process."); *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001) ("The evaluation of excessive-force claims brought by pretrial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard.").

However, excluding Mr. Leach's opinions in their entirety and striking his expert report are extreme responses to an incidental misstatement of the applicable legal standard—particularly where it is for the *court* to determine and instruct the jury on the applicable legal standard. As noted above, where Mr. Leach actually states an opinion about the use of force in this case, he applies a "reasonableness" standard like the Fourth Amendment standard that is applicable under controlling law. I will not exclude either Mr. Leach's testimony or his report, in its entirety, on this ground.

### b.    Peters's "relevancy" challenge

Peters is correct that the bigger problem with Mr. Leach's opinions is that he opines on the ultimate legal question of whether or not the Defendant Officers used "excessive force," in violation of Peters's rights, so that at least some of his testimony

would be inadmissible on "relevancy" grounds. Problems with expert opinions on either factual or legal issues may run into "relevancy" problems.

For example, in *Lee*, the Eighth Circuit Court of Appeals concluded that an images analyst's expert opinion on a *factual* matter—that the person shot by a law enforcement officer did not have a gun in his hand—was properly excluded under Rule 702, because that opinion would not have assisted the jurors, who were entirely capable of analyzing the images and determining whether the victim had anything in his hands. 616 F.3d at 809; *see also Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." (internal quotation marks and citations omitted)). In *Schmidt v. City of Bella Villa*, 557 F.3d 564 (8th Cir. 2009), a "strip search" case, the Eighth Circuit Court of Appeals considered the relevance of an expert's opinion on a *legal* matter:

> The district court found that Russo's expert opinions regarding the reasonableness of the evidence collection and strip search procedures were impermissible legal conclusions. Russo's report consisted of his opinions regarding the overall reasonableness of the procedures used and, as such, were not fact-based opinions. *See Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995) (expert testimony on reasonableness of police behavior in light of Fourth Amendment standards is statement of legal conclusions and not admissible). In addition, Russo's report is devoid of any standards and explanations that would assist the trier of fact in contextualizing his opinions. *See United States v. Ellsworth*, 738 F.2d 333, 336 (8th Cir.1984) (expert's "conclusory statement" properly excluded for lack of foundation). Accordingly, we cannot say that the district court abused its discretion by refusing to admit Russo's testimony regarding the reasonableness of police procedures.

*Schmidt*, 557 F.3d at 570; *see also Cavataio v. City of Bella Villa*, 570 F.3d 1015, 1022 (8th Cir. 2009) (holding that a police officer's expert testimony would not have assisted the trier of fact in understanding that a policeman should not squeeze an elderly woman's breast).

The defendants argue that courts have generally held that expert opinions regarding industry or institutional practices and standards are admissible, citing *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). I agree with the defendants that police or jail standards, practices, and procedures are matters outside the scope of most lay jurors' knowledge or experience, so that expert testimony about them is likely to be helpful to the jurors, and, thus, satisfies the "basic rule" or the "touchstone" of relevancy. *Polski*, 538 F.3d at 839; *accord Lee*, 616 F.3d at 808-09. Nevertheless, in *Southern Pine Helicopters*, the Eighth Circuit Court of Appeals made clear that what was admissible was expert testimony "on what these [practices or standards] *are*." 320 F.3d at 841 (emphasis added). The court explained that the case before it was not about practices and standards; rather, "[t]h[at] case was about whether federal law was contravened, and expert opinion as to that was simply inadmissible." *Id*. Thus, *Southern Pine Helicopters* teaches that an expert *may* opine on what institutional practices *are*, although an expert *may not* testify that federal law was contravened. The decision in *Southern Pine Helicopters* does not answer the question of whether an expert may opine that practices or standards were followed or contravened in the case before the jury to assist the jurors with their "reasonableness" determination.

Some review of the decisions of other Circuit Courts of Appeals on the admissibility of expert testimony in "excessive force" cases is instructive. These cases distinguish between testimony about an "ultimate issue," which is permissible under Rule 704(a), and testimony about a "legal conclusion," which is not permissible under

that rule. For example, in *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), the Sixth Circuit Court of Appeals explained:

> Although an expert's opinion may "embrace[ ] an ultimate issue to be decided by the trier of fact[,]" Fed.R.Evid. 704(a), the issue embraced must be a factual one. The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens.
>
> It would have been easy enough for the drafters of the Federal Rules of Evidence to have said that a properly qualified expert may opine on the ultimate question of liability. They did not do so. When the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue. We would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact). The distinction, although subtle, is nonetheless important.
>
> Furthermore, "deliberate indifference" is a legal term, as the questioning of Postill [an expert in the case] indicated. It is the responsibility of the court, not testifying witnesses, to define legal terms. The expert's testimony in this regard invaded the province of the court.

*Berry*, 25 F.3d at 1353. Thus, *Berry* suggests the answer to the question left open in *Southern Pine Helicopters*: an expert's opinion may embrace an ultimate issue of *fact*, including what are standards or practices applicable to the incident involving Peters,

and whether or not certain standards or practices were met by the conduct of the Defendant Officers in the incident involving Peters, but an expert may not testify that following or failing to follow certain standards met or failed to meet the applicable *legal* standard, such as "reasonableness" of the Defendant Officers' use of force against Peters. *Id.*

In *United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006), the Fourth Circuit Court of Appeals also discussed when the line is crossed between permissible expert testimony on an ultimate issue and impermissible expert testimony expressing a legal conclusion. In *Perkins*, the defendant police officer, charged with a criminal felony offense of depriving a motorist of his constitutional right to be free from unreasonable force, in violation of 18 U.S.C. § 242, argued that the district court had erred in admitting both expert and non-expert testimony regarding the reasonableness of the police officer's use of force on the ground that such testimony impermissibly stated a legal conclusion. *Id.* at 157.

In *Perkins*, the court first explained that an expert may respond to *hypothetical* or *abstract questions* about the reasonableness of the force used in stated circumstances. *Perkins*, 470 F.3d at 156 (explaining that, while an expert may so testify, pursuant to Rule 702, a lay witness may not offer opinions based on secondhand accounts, because the lay witness would lack the personal knowledge required for lay opinions by Rule 701). Ultimately, the court concluded as follows:

> *[United States v.] Mohr*[, 318 F.3d 613 (4th Cir. 2003),] suggests that the challenged testimony in this case did not transgress Rule 704(a). Like in *Mohr*, the officers here testified that they saw "no reason" for Perkins's use of force. *Cf. id.* Taking helpfulness to the jury as our guiding principle, we conclude that the district court did not err in admitting the challenged portions of [non-expert witness] Officer House's and [expert witness] Inspector Burnett's testimony. While a very close question, *we conclude that the*

28

*Government's questions were phrased in such a manner so as to avoid the baseline legal conclusion of reasonableness. See Torres [v. County of Oakland]*, 758 F.2d [147,] 151 [(6th Cir. 1985)]. The officers' responses that they personally saw no reason for Perkins's kicks provided the jury with concrete examples against which to consider the more abstract question of whether an "objectively reasonable officer" would have employed the same force. The Government's questions were not couched in terms of objective reasonableness; instead, they honed in on Officer House's and Inspector Burnett's *personal* assessments of Perkins's use of force. We recognize that this distinction is a fine one. When the common and legal meanings of a term are not easily unfurled from each other, however, as is certainly the case with "reasonable," it is difficult for us to conclude that testimony was unhelpful to the jury unless the testimony actually framed the term in its traditional legal context. In this case, then, Rule 704 justifies differentiating between the officers' testimony that they saw no "law enforcement" or "legitimate" reason for Perkins's kicks and testimony that Perkins's actions were "objectively unreasonable." To be sure, this distinction must be measured in inches, not feet. Nevertheless, we cannot hold that the officers' testimony was necessarily unhelpful, nor can we say that it merely told the jury what verdict to reach or "supplant[ed][the] jury's independent exercise of common sense." *Kopf [v. Skyrm]*, 993 F.2d [374,] 377 [(4th Cir. 1993)].

*Perkins*, 470 F.3d at 159-60 (footnotes omitted; first emphasis added, second emphasis in the original). In a footnote, the court in *Perkins* recognized that its conclusion was different from that of the Second Circuit Court of Appeals in *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992), an "excessive force" case, in which the Second Circuit Court of Appeals concluded that the expert's testimony that "in his opinion, the use of a baton or flashlight to strike a person in the head would constitute 'deadly physical force' that would not be 'justified under the circumstances'" violated Rule 704(a), even though it

did not use the language of the ultimate legal standard. *Id.* at 160 n.13 (citing *Hygh*, 961 F.2d at 363).

Thus, *Perkins* teaches the following: (1) an expert may provide opinions that are phrased in such a manner as to avoid the baseline legal conclusion, for example, the "reasonableness" of the force used, *id.* at 159; (2) an expert may also respond to *hypothetical* or *abstract questions* about the reasonableness of the force used in stated circumstances, *id.* at 156; (3) an expert may also offer a *personal* assessment of the use of force, such as that the expert did or did not see any reason for the force used in the incident in question, *id.* at 160; but (4) an expert may *not* opine that the conduct in question transgressed the applicable *legal* standard, such as "objective reasonableness," *id.*

Like the Sixth and Fourth Circuit Courts of Appeals, the Fifth Circuit Court of Appeals has held that expert testimony about the "reasonableness" of the force used, in that case, a shooting by police, violated Rule 704(a), because "[r]easonableness under the Fourth Amendment or Due Process Clause is a legal conclusion." *United States v. Williams*, 343 F.3d 423, 345 (5th Cir. 2003). Similarly, in *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 (10th Cir. 2013), the Tenth Circuit Court of Appeals explained that one way to "ensure that the jury connected the dots from the objective facts to the conclusion that force was warranted" was that "[a] police practices expert could have testified that under the circumstances faced by [the officer who applied the allegedly "excessive force"] a reasonable officer would have concluded that [the victim] was a threat and used similar force." 718 F.3d at 1251. This is not the same, of course, as allowing a police practices expert to testify that the Defendant Officers' use of force in *the particular* case was "reasonable," which is an ultimate legal conclusion. Indeed, the Tenth Circuit Court of Appeals had previously reiterated, "'Generally, an expert may not state his or her opinion as to legal standards nor may he or she state

legal conclusions drawn by applying the law to the facts.'" *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (quoting *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998)).

With these principles in mind, *assuming that Mr. Leach is properly qualified and that proper disclosures of his opinions have been made*, Mr. Leach would and would not be allowed to testify to the following matters in this case. First, Mr. Leach *would not* be allowed to opine on a *factual* matter on which the jurors are entirely capable of making a determination—such as what force was used by the officers, *see Lee*, 616 F.3d at 809; *Westcott*, 68 F.3d at 1076, nor would he be allowed to base his opinion on what he believes the correct version of the facts to be. *Westcott*, 68 F.3d at 1076. On the other hand, if he is properly qualified, Mr. Leach would be allowed to explain the *kind* of force applied, such as whether or not Sergeant Blanchard actually applied a "mandibular angle restraint," and even whether or not Sergeant Blanchard applied that restraint properly, as well as whether using that particular restraint was appropriate in the circumstances presented, under recognized standards and practices for jail administration. *Cf. Southern Pine Helicopters*, 320 F.3d at 841; *Berry*, 25 F.3d at 1353. Also, Mr. Leach could permissibly testify as to what routine and acceptable correctional practices in jails *are*, based on his training and expertise as a correctional administrator and instructor. *Id*. I note that Mr. Leach's expert report does make permissible general references to certain statements of standards concerning "use of force" for the administration of jails or prisons. *See* Defendants' Appendix In Resistance To Motion To Exclude Expert a 98-99 (Leach Expert Report at 17-18 & nn.9-10). Mr. Leach would be allowed to respond to *abstract* or *hypothetical* questions by opining that the force described was or was not reasonable in the circumstances described in the question, and would even be permitted to opine as to whether he *personally* believed that the force used against Peters was reasonable under the

31

circumstances, but he would *not* be allowed to opine that the use of force satisfied the *legal* standard of "reasonableness." *Perkins*, 470 F.3d at 159-60.

I note, however, that Mr. Leach's report makes no express reference to the purportedly generally applicable standards for jail administration in his analysis of the application of force to Peters, a topic on which the defendants contend that he will testify. Rather, he repeatedly states what may be prohibited *legal* opinions, rather than permissible *personal* opinions, that the Defendant Officers' application of force against Peters was "reasonable." To the extent that his references to "reasonableness" are opinions purportedly cast in terms of the applicable *legal* standard, they are inadmissible. Furthermore, he may *not* testify to any opinions about whether the *legal* standard was met, particularly where he frames that *legal* standard incorrectly as an Eighth Amendment "wanton and unnecessary" use of force standard. I also see little in Mr. Leach's report that could be considered an attempt to "ensure that the jury connected the dots from the objective facts to the conclusion that force was warranted," such as this purported jail practices expert's opinions "that under the circumstances faced by [the Defendant Officers] a reasonable officer would have concluded that [Peters] was a threat and used similar force," stopping short of stating an opinion framed in terms of the ultimate *legal* question and the applicable *legal* standard. *Cavanaugh*, 718 F.3d at 1251.

### C.     Summary

I will not grant Peters's Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II, to the extent of excluding Mr. Leach's testimony and report in their entirety. I will grant that Motion, however, to the extent that I will limit Mr. Leach's trial testimony in the ways described above.

### III. THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In their Motions For Summary Judgment, the defendants assert that they are entitled to summary judgment on each of Peters's remaining claims on the ground that the Defendant Officers are entitled to qualified immunity with respect to those claims. They also contend that Peters cannot assert claims based on alleged violations of the Iowa Constitution, that the Defendant Officers are entitled to summary judgment on claims based on jail policy, and that the County Defendants are entitled to summary judgment on claims based on "*Monell* liability." I will consider these contentions in turn. I will first summarize the standards applicable to a motion for summary judgment, as those standards are applicable to all of the defendants' challenges to Peters's claims.

### A. Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal

quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*). Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## B.     Challenges Based On Qualified Immunity

### 1.     Standards for qualified immunity

In this case, the defendants seek summary judgment on Peters's claims, in the first instance, on the basis of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Burton v. St. Louis Bd. of Police Cmm'rs*, ___ F.3d ___, ___, 2013 WL 5336524, *3 (8th Cir. Sept.

24, 2013) (quoting *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012)); *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011); *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011). In *Pearson*, the United States Supreme Court offered this explanation of the reasoning behind the concept of qualified immunity:

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), for the proposition qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

*Pearson*, 555 U.S. at 231. To put it another way, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine "allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued." *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008) (internal quotation marks omitted); *accord al-Kidd*, ___ U.S. at ___, 131 S. Ct. at 2085 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

Furthermore, "[q]ualified immunity is 'an immunity from suit rather than a mere defense to liability, [so that] it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985)). Thus, the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*)).

The Supreme Court and the Eighth Circuit Court of Appeals have explained that "[e]valuating a claim of qualified immunity requires a 'two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted); *accord Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236; *Johnson*, 658 F.3d at 825; *Fields*, 652 F.3d at 890; *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). The official is entitled to qualified immunity unless the answer to both of these questions is yes. *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted); *Krout*, 583 F.3d at 564.

Considering the two prongs of the test in a little more detail, "[i]f the allegations and undisputed facts do not amount to a constitutional violation, 'there is no necessity for further inquiries concerning qualified immunity.'" *Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) (quoting *Saucier*, 533 U.S. at 201). Thus, the court must consider whether the factual record, viewed in the light most favorable to the plaintiff, supports a conclusion that the defendant officer or officers violated the plaintiff's constitutional rights. *SL ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850 (8th Cir. 2013).

As to the "clearly established law" prong, the Eighth Circuit Court of Appeals has explained,

"'[I]n the light of pre-existing law the unlawfulness [of the official's action] must be apparent.'" *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Qualified immunity would be defeated if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff[s]." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir.2006) (alterations omitted) (emphasis in original) (citation and internal quotation marks omitted); *see Sisney v. Reisch*, 674 F.3d 839, 847 (8th Cir.2012) (explaining that officials receive qualified immunity if they lacked "fair notice" that their actions were unlawful). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir.2004) (citation and internal quotation marks omitted).

*Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013).

Moreover, as the Supreme Court has rejected the adequacy of prior recognition of a generalized right to satisfy the "clearly established right" prong of the analysis:

We have repeatedly told courts—and the Ninth Circuit in particular, *see Brosseau v. Haugen*, 543 U.S. 194, 198–199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)—not to define clearly established law at a high level of generality. *See also, e.g., Wilson [v. Layne]*, [526 U.S. 603,] 615, 119 S.Ct. 1692 [(1999)]; *Anderson [v. Creighton]*, [483 U.S. 635,] 639–640, 107 S.Ct. 3034 [(1987)]; *cf. Sawyer v. Smith*, 497 U.S. 227, 236, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201–202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Wilson, supra,* at 615, 119 S.Ct. 1692.

*Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S. Ct. 2074, 2083 (2011). This does not mean, however, that prior precedent exactly on point is required to demonstrate that the unconstitutionality of the officer's actions was "clearly established":

> "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Shekleton [v. Eichenberger]*, 677 F.3d [361,] 367 [(8th Cir. 2012)] (internal alteration marks omitted). "[T]he unlawfulness must merely be apparent in light of preexisting law, and officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 531 (8th Cir.2009) (en banc) (internal citation and quotation marks omitted).

*Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012). Whether a constitutional right at issue was "clearly established" is a question of law for the court to decide. *Bishop v. Glazier*, 723 F.3d 857, 961 (8th Cir. 2013) (citing *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009)).

Under *Pearson*, I have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236 (holding that the sequence of the two-prong test as set forth in *Saucier*, while often appropriate, is not mandatory); *Johnson*, 658 F.3d at 825; *Fields*, 652 F.3d at 890. Indeed, the full two-step protocol "should not be regarded as mandatory in all cases," even though "it is often beneficial." *Id.* The Court reiterated in *Pearson* that "'[i]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.'" *Id.* (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 205) (Sutton, J., concurring). On the other hand, considering both questions "sometimes results in a substantial expenditure of scarce judicial resources on difficult

questions that have no effect on the outcome of the case," because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 236-37. Specifically, in *Pearson*, the Court found that the "clearly established right" prong of the analysis was fully dispositive of the case before it, because it established that the officers involved were entitled to qualified immunity. *Id.* at 243-45; *accord Bishop*, 723 F.3d at 961-62 (starting and ending its analysis of qualified immunity with the second prong of the analysis, the "clearly established right" determination); *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) ("If [the law] was not clearly established, regardless of whether [the plaintiff] has articulated a constitutional violation, the [defendants] are entitled to qualified immunity.").

The Eighth Circuit Court of Appeals reviews *de novo* a decision granting summary judgment on the basis of qualified immunity. *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted).

### 2.    The *"violation of privacy rights" claim*[12]

In Count I of her Amended Complaint, Peters alleges that the Defendant Officers violated her Fourth Amendment rights when they engaged in an unlawful "strip search" of her, because they lacked reasonable suspicion that she was concealing contraband or a weapon, and conducted the "strip search" in an unlawful manner, because there was no authorization under the United States Constitution or the Iowa Constitution for any officer (male or female) to be present in the holding cell while she changed into a jail

---

[12] For reasons stated in detail, *infra*, beginning at page 56, I prefer to describe this claim as a "violation of privacy rights" claim or an "intrusion on privacy" claim, rather than as a "strip search" claim, as Peters describes it.

jumpsuit.  Amended Complaint, Count I, ¶ 42.  She also alleges that the "[d]efendants have established, maintained, and enforced policies, regulations, official decisions, customs, or usages which unconstitutionally deprive its citizens of the right to be free of unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution, and Article I, Section 8, of the Iowa Constitution."  *Id*. at ¶ 44.  The defendants deny that Peters was subjected to a "strip search" and assert that they are entitled to summary judgment on this claim, however it is denominated, under the proper constitutional standard, on both prongs of the qualified immunity analysis.

As to the first prong of the qualified immunity analysis, whether there was a violation of Peters's constitutional rights when the Defendant Officers stripped her, the defendants argue that it is unclear whether Peters's rights stem from and are subject to a Fourth Amendment "reasonableness" standard or a Fifth and Fourteenth Amendment "due process" standard, where Peters was stripped during the booking process after her arrest.  The defendants also argue that, on the undisputed record, there was no "strip search" at all, only a "clothing exchanges."  These arguments necessitate a determination of the source of the right allegedly violated and the nature of the conduct at issue in Peters's claim in Count I.

### a. *Source of the right*

#### i. *Arguments of the parties*

The defendants argue that Peters is "quick" to allege that the alleged "strip search" during the booking process violated a Fourth Amendment right, despite the open question of which constitutional amendment controls her claim.  They contend that the Fourth Amendment governs the conduct of law enforcement officials at the time of an arrest, but that, once an arrestee becomes a pretrial detainee, the due process standard of the Fifth and Fourteenth Amendments applies and that this standard considers whether the defendants' actions amounted to "punishment."  The defendants

argue that, while Circuit Courts of Appeals are divided on when an arrestee becomes a pretrial detainee, the Eighth Circuit Court of Appeals has applied a Fourth Amendment standard to claims of an arrestee who was restrained after becoming violent and disruptive during the booking process. They contend that, at the very least, Peters was "in transition" from an arrestee to a pretrial detainee. Peters argues that there is no uncertainty that the Fourth Amendment is the source of the right at issue.

### ii. *Analysis*

As to the source of the right at issue—and, hence, the applicable constitutional standard—the defendants' attempts to create confusion are unavailing, because the cases they cite as applying a Fifth and Fourteenth Amendments "due process" standard are inapposite. Specifically, the defendants assert that, after an individual becomes a pretrial detainee, the "due process" standard of the Fifth and Fourteenth Amendments applies, citing *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048-49 (9th Cir. 1989), but *Johnson-El* is a "conditions of confinement" case, not a case involving allegations of improper searches or other violation of privacy rights. *Id*. at 1048 ("Unlike convicted prisoners, the state has no right to punish [pretrial detainees], [and] *[t]heir confinement conditions* are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather that the Eighth Amendment's 'cruel and unusual punishment' standard which is used for convicted prisoners." (internal citations omitted; emphasis added)). The decision in *Morris v. Zefferi*, 601 F.3d 805 (8th Cir. 2010), on which the defendants also rely, is inapposite for the same reasons. *See* 601 F.3d at 807 (explaining that the plaintiff's claim was that an officer "violated [his] constitutional rights when [the officer] transported [the plaintiff], who at the time was a pretrial detainee, in a dog cage in a K-9 vehicle during a ninety-minute drive from the Crawford County Jail to the Pulaski County Courthouse"); *id*. at 809 ("Because [the plaintiff] was a pretrial detainee at the time of the alleged violation of his constitutional

41

rights, we analyze [his] claim against [the defendant officer] under the Fourteenth Amendment, rather than the Eighth Amendment."). Neither *Johnson-El* nor *Morris* can be read for the blanket proposition that *all* claims by a pretrial detainee are governed by a Fifth and Fourteenth Amendment "due process" standard that considers whether the officers' conduct amounted to "punishment," but only that *conditions of confinement* claims by pretrial detainees are governed by such a standard, rather than the Eighth Amendment "cruel and unusual punishment" standard. Although the defendants acknowledge that, in *Moore v. Novak*, 146 F.3d 531 (8th Cir. 1998), the Eighth Circuit Court of Appeals has applied a Fourth Amendment "objective reasonableness" test to the claim of an arrestee who became disruptive during the booking process, that case is also inapposite, because the claim at issue concerned use of "excessive force," not a search or other violation of privacy rights. 146 F.3d at 535.

More apposite are decisions of the Supreme Court and the Eighth Circuit Court of Appeals concluding that claims arising from intrusions on the privacy rights of an arrestee or a pretrial detainee during booking or detention are governed by a Fourth Amendment "reasonableness" standard. For example, in *Maryland v. King*, ___ U.S. ___, 133 S. Ct. 1958 (2013), the Supreme Court concluded,

> DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

*King*, ___ U.S. at ___, 133 S. Ct. at 1980; *see also Florence v. Board of Chosen Freeholders of Cnty. of Burlington*, ___ U.S. ___, 132 S. Ct. 1510 (2012) (applying

Fourth Amendment "reasonableness" standards (via the Fourteenth Amendment) to claims of pretrial detainees arising from invasive search procedures absent reasonable suspicion of a concealed weapon or other contraband). Similarly, in *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), the Eighth Circuit Court of Appeals applied Fourth Amendment "reasonableness" standards to a claim of a female pretrial detainee that her right to privacy was violated when a male guard required her to disrobe in his presence before placing her in a padded cell for her own safety after she became loud and violent during booking procedures. 311 F.3d at 903.

Of course, Fourth Amendment standards are applicable against state actors via the Fourteenth Amendment. *See Florence*, ___ U.S. ___, 132 S. Ct. 1510; *Burlison v. Springfield Public Schools*, 708 F.3d 1034, 1039 (8th Cir. 2013) ("The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers."). Thus, Fourth Amendment "reasonableness" standards are applicable to Peters's claim in Count I, rather than other "due process" or "punishment" standards, even if the applicability of a Fourth Amendment "reasonableness" standard is via the Fourteenth Amendment.

### b.    *Nature of the conduct*

### i.    *Arguments of the parties*

As to the nature of the conduct at issue, the defendants argue that Peters was not "strip searched" as a matter of law, because the removal of Peters's clothes involved only incidental viewing of her body, not an inspection of her body or body cavities for contraband. Indeed, they contend that other Circuit Courts of Appeals have called incidents involving directions that an arrestee change into jail attire in front of an officer, resulting in only incidental observation of the arrestee's body, "clothing

exchanges." The defendants argue that, while Peters arguably may have been subjected to a "search," she was clearly not subjected to a "strip search." Peters argues that the conduct of the officers in removing her clothes during the booking process was a "strip search," within the meaning of both an Iowa statute and federal case law, because she was not only observed from a distance of, say, five feet, but was forced face down on a bunk by three officers, two of whom were male, and her clothes were removed with sufficient force to rip some of them.

ii.     *Analysis*

Whether the conduct of the Defendant Officers upon which Peters's claim in Count I is based was a "strip search," or a "search," or merely a "clothing exchange" is important, because, as explained below, it determines the precise content of the Fourth Amendment "reasonableness" inquiry applicable to this claim. As the parties are also no doubt aware, labeling conduct a "strip search" necessarily invites a greater emotional response from jurors than labeling it a "search" or a "clothing exchanges."

The determination of the nature of the conduct at issue in Peters's purported "strip search" claim in Count I is complicated by the lack of a clear line between the conduct at issue in this claim, and the conduct at issue in Peters's "excessive force" claim in Count III. I will attempt to draw that line more clearly, both for the purposes of coherent analysis and for the purposes of coherent presentation of the claims to a jury, if Peters's claims proceed to trial.

Specifically, I will construe Peters's claim in Count I as involving the question of the reasonableness of forcibly removing Peters's swimsuit, in the presence of both male and female officers, under the circumstances presented. Construing Peters's claim in Count I in this way is consistent with her allegations in that count that the defendants engaged in an unlawful "strip search" of her, because they lacked reasonable suspicion that she was concealing contraband or a weapon, and conducted

44

the "strip search" in an unlawful manner, because there was no authorization under the United States Constitution or the Iowa Constitution for any officer (male or female) to be present in the holding cell while she changed into a jail jumpsuit. Amended Complaint, Count I, ¶ 42. These specific allegations focus on the *removal of Peters's clothing, albeit forcibly, in the presence of officers (male or female)*, in response to a direction from officers to remove her clothes and her refusal to do so. In contrast, I will construe Peters's "excessive force" claim in Count III as involving the question of the reasonableness of the force actually used to effect removal of Peters's swimsuit. Construing Peters's claim in Count III in this way is consistent with her allegations in that count that the defendants "use[d] excessive force in strip searching Peters in violation of both the Constitutions of the United States, Fourth Amendment, and the State of Iowa, Article 1, Section 8," and that certain Defendant Officers "all touched, shoved, grabbed[,] hit and/or struck Peters in an unreasonable and unnecessary manner, causing her physical and emotional injury." Amended Complaint, Count III, ¶ 65. These allegations focus on the *amount of force used in removing Peters's clothes*.

I turn, next, to the question of whether the conduct at issue in Count I, as I have construed that claim, constituted a "strip search." The standard for a "strip search" of an arrestee or pretrial detainee is informed, if not ultimately controlled, by the Supreme Court's recent decision in *Florence v. Board of Chosen Freeholders of Cnty. of Burlington*, ___ U.S. ___, 132 S. Ct. 1510 (2012). As I explained in *Rattray v. Woodbury County, Iowa*, 908 F. Supp. 2d 976 (N.D. Iowa 2012), I read *Florence* to state the following *legal rule*: "Reasonable suspicion is *not* required to strip search detainees, subject to possible, but as-yet not fully defined, exceptions." 908 F. Supp. 2d at 993 (citing *Florence*, ___ U.S. at ___, 132 S. Ct. at 1522-25). In *Rattray*, I concluded that this statement of the *legal rule* overruled the prior circuit *legal rule* that

adult detainees cannot be searched without reasonable suspicion, regardless of the circumstances. *Id*. at 995.

Unfortunately, the decision in *Florence* did not fully clarify the circumstances in which a "strip search" would *still* require "reasonable suspicion" to be "reasonable." Peters—like the plaintiffs in *Rattray*—reads *Florence* narrowly, to stand for the proposition that prior circuit law requiring "reasonable suspicion" for a "strip search" still applies, unless the detainee would be admitted to the "general population" of the jail, or required to share a holding cell, or required to have "substantial contact" with other detainees. In other words, Peters argues that the limited scope of *Florence* means that prior circuit precedent, which required "reasonable suspicion" for most "strip searches," is applicable here, because that precedent was left untouched by *Florence*'s elimination of a "reasonable suspicion" requirement only for "strip searches" in certain specific circumstances. *If* Peters's reading of *Florence* is correct, *and* the conduct at issue here was a "strip search," *and* Peters was not admitted to "general population" of the jail or otherwise required to have "substantial contact" with other detainees, *then* the Fourth Amendment "reasonableness" standard required that the Defendant Officers have "reasonable suspicion" to "strip search" Peters. Of course, I need not settle the question of the circumstances in which a "strip search" still requires "reasonable suspicion" after *Florence*, if there was no "strip search" in this case, as a matter of law.

Whatever the correct reading of *Florence*'s partial elimination of a "reasonable suspicion" requirement for "strip searches" may be, that decision provides guidance for this case on the question of whether or not Peters was subjected to a "strip search." As to the definition of a "strip search," the Supreme Court explained in *Florence*:

> The term is imprecise. It may refer simply to the instruction
> to remove clothing while an officer observes from a distance
> of, say, five feet or more; it may mean a visual inspection

> from a closer, more uncomfortable distance; it may include
> directing detainees to shake their heads or to run their hands
> through their hair to dislodge what might be hidden there; or
> it may involve instructions to raise arms, to display foot
> insteps, to expose the back of the ears, to move or spread
> the buttocks or genital areas, or to cough in a squatting
> position. In the instant case, the term does not include any
> touching of unclothed areas by the inspecting officer.

*Florence*, ___ U.S. at ___, 132 S. Ct. at 1515. Peters contends that she was subjected to a "strip search" within the scope of this definition. On the other hand, the defendants assert that Peters's claim in Count I involved only a "clothing exchange," not a "strip search," so that "reasonable suspicion" plays no part in the analysis.

In *Kelsey v. County of Schoharie*, 567 F.3d 54 (2d Cir. 2009), a pre-*Florence* decision on which the defendants rely for their argument that Peters was only subjected to a "clothing exchange," not a "strip search," the Second Circuit Court of Appeals observed,

> Various terms are used to describe the inspection of a
> naked body, and the terms are distinguished by the degrees
> of intrusion involved in the search for contraband. The term
> "strip search" is used generally to describe any inspection of
> the naked body. *See N.G. v. Connecticut*, 382 F.3d 225,
> 228 n. 4 (2d Cir.2003). An individual being strip searched
> may be required to move his body in various ways to permit
> a more complete inspection. *Id.* A "visual body-cavity
> search" is a strip search that entails the specific examination
> of the genitals and anus, without any bodily contact by the
> inspector. *Id.* Finally, a "manual body-cavity search" is a
> strip search that involves a naked body examination,
> including a viewing of the genitals and anus, by touching or
> probing with an instrument. *Id.*

*Kelsey*, 567 F.3d at 62. Thus, the Second Circuit Court of Appeals suggested different terms for the various degrees of intrusion that fall within the scope of a "strip search," which it identified as the generic term for "any inspection of the naked body."

*Compare Florence*, ___ U.S. at ___, 132 S. Ct. at 1515 (explaining the scope of conduct recognized as constituting a "strip search").

The court in *Kelsey* then considered the incident at issue, which it concluded was merely a "clothing exchange," not a "strip search" involving any of the higher degrees of intrusion:

> We first observe that the plaintiffs make no claim that they were subjected to visual or manual body cavity searches. Plaintiff Kelsey testified that a corrections officer stood in front of him during the brief period when he removed his street clothes and put on the jail uniform. Kelsey testified that he "assume[d]" that the officer "saw [his] genitals" during that time. Kelsey was not asked to manipulate his body in any way or to assume any particular position. Nor was he prevented from protecting his privacy by turning away from the officer as he undressed, by concealing the lower half of his body behind the half-wall in front of which he was standing, or by using the towel that was available to him during the "clothing exchanges". In any event, briefly "seeing" a man's genitals during a "clothing exchanges" does not amount to a strip search.

*Kelsey*, 567 F.3d at 63 (footnote omitted).

The court in *Kelsey* concluded that, not only was a "clothing exchange" not a "strip search," but that there had been no "search" at all as to at least one plaintiff:

> Plaintiff Wright's characterization of the "clothing exchanges" as a search is even more attenuated. According to Wright, the "clothing exchanges" took place in a holding cell, where he disrobed in one minute as a corrections officer stood in front of him. Wright testified that he undressed "[a]t somewhat of an angle" to the officer but could not "recall 100 percent which way [he] was facing." As best he could describe it, "[it] was like sort of facing toward the officer." Apparently, a towel was available to him as he disrobed, and he took the towel with him as he went to take a shower before returning to the holding cell

with the towel. Back in the cell, he dressed in the jail uniform. According to Wright's version of events, no officer was present when he put on the jail uniform. Also, as with Kelsey, Wright was not required to move or display his body in any particular way.

Corrections Officer Kenyon, who supported the testimony of plaintiff Wright, at least to the extent of indicating that the "clothing exchanges" took place in a holding cell (rather than behind the half-wall), declared that "the purpose of the "clothing exchanges" process, as far as I know, is simply to get inmates into the jail uniform and secure their street clothing." Nevertheless, a necessary function of any corrections officer is to observe inmates at all times, whether the inmate is eating, sleeping, showering, undertaking recreational activity or engaging in any other activity within the confines of any jail.

*Kelsey*, 567 F.3d at 63-64 (footnote omitted).

Thus, the court in *Kelsey* identified the following differences in purposes and degrees of intrusion between a "clothing exchange" and a "strip search": A "strip search" is conducted for the purpose of discovering contraband, and involves some level of scrutiny of the detainees' naked body, possibly including inspection of genitals or body cavities, *see id.* at 62; *accord Florence*, ___ U.S. at ___, 132 S. Ct. at 1515, but a "clothing exchange" is conducted for the purpose of placing detainees in jail attire and retaining their street clothing, and involves only incidental viewing of the detainees' naked body and genitals. *Id.* at 63-64. As I suggested, above, a further distinction is that a "strip search" may or may not require "reasonable suspicion," depending upon the circumstances in which it is conducted, *see Florence*, ___ U.S. at ___, 132 S. Ct. at 1522-25, but "reasonable suspicion" is not required for a "clothing exchange." *Kelsey*, 567 F.3d at 65 (concluding that circuit precedent holding that "reasonable suspicion" was necessary for a "strip search" "d[i]d not control" a case involving only a "clothing exchange").

49

The court in *Kelsey* concluded that a "clothing exchange," like a "strip search," is subject to Fourth Amendment "reasonableness" standards. *Id.* at 64. In deciding whether this "reasonableness" standard had been met, the court considered the legitimacy of the goals behind the "clothing exchanges" and the degree of the intrusion upon the detainees' privacy. *Id.* at 64-65 (ultimately concluding that those standards were not violated in the case before it, because that case involved only "incidental observation of the body of an arrestee during a required "clothing exchanges""). The content of this "reasonableness" analysis is consistent with the Supreme Court's recognition in *Florence* of the general Fourth Amendment standard for "reasonableness," which requires assessment of the need for a particular "search" or "intrusion on an inmate's privacy" balanced against the resulting invasion of personal rights, but does not require "reasonable suspicion" in all circumstances. *Florence*, ___ U.S. at ___, 132 S. Ct. at 1516 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

In another pre-*Florence* decision, *Stanley v. Henson*, 337 F.3d 961 (7th Cir. 2003), on which the defendants also rely, the Seventh Circuit Court of Appeals concluded that a "clothing exchange" was a "search" subject to the Fourth Amendment "reasonableness" requirement, whether or not it was also a "strip search," but that it was not a "search" requiring "reasonable suspicion." 337 F.3d at 963-67. In that case,

> Stanley [the plaintiff] was then required to go through the jail's clothing-exchange procedure. Officer Henson [a female] directed her to a small, doorless room near the booking area. The room was partially divided by a cinder-block wall approximately four feet in height, behind which a toilet was located. Mounted on the wall near the booking area was a video camera, which Ms. Stanley initially believed was filming the area in which she was changing (she subsequently learned that the camera does not film that area). Officer Henson provided Ms. Stanley with a jail-

> issued uniform and told her to remove all her street clothing, except for her underpants, to change into the uniform. Ms. Stanley was not wearing a brassiere at that time, requiring her to expose her breasts as she changed. While Ms. Stanley disrobed (in the front portion of the room, not behind the cinder-block wall), Officer Henson remained in the room, continuously observing her until she was dressed in the jail uniform, but at no time did Officer Henson touch Ms. Stanley nor did she conduct any visual inspection of Ms. Stanley's body cavities. The entire exchange process took approximately two minutes. Ms. Stanley was then taken to a cell where she remained with several other women, but she was never introduced into the jail's general population.

*Stanley*, 337 F.3d at 962.

The court in *Stanley* noted that the defendant officer argued that the "clothing exchange" was not a "strip search," because it was simply a "'routine security and admission procedure at a detention facility.'" *Id.* at 964 (quoting the defendant's argument). The court did not fully accept this argument, however, concluding,

> The presence of a jail officer who continuously observed Ms. Stanley as she exchanged her clothing, however, suggests that this was more than an administrative procedure for changing into a jail uniform; it implies that the officer's purpose was to watch over Ms. Stanley to ensure that nothing illicit was brought into or out of the jail.

*Stanley*, 337 F.3d at 964. Nevertheless, the court concluded that "[w]hether we further label this process a 'strip search' or merely a 'search' is unimportant, as the analysis remains the same," and, indeed, that "[w]hether the procedure at issue here was a 'strip search' or just a 'search' more appropriately goes to the question of the scope or manner of the intrusion involved." *Id.* at 964 & n.2. As in *Kelsey*, the court in *Stanley* concluded that the standard for assessing the "reasonableness" of this "search" required "'a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" *Id.* (quoting *Bell*, 441 U.S. at 559). The court in

*Stanley*, also like the court in *Kelsey*, did not consider "reasonable suspicion" to be part of the Fourth Amendment analysis, where the intrusion was "relatively minimal." *Id.* at 967.

Here, Peters argues that she was subjected to a "strip search" within the meaning of IOWA CODE § 702.23. That state statute defines a "strip search" as "having a person remove or arrange some or all of the person's clothing so as to permit an inspection of the genitalia, buttocks, anus, female breasts or undergarments of that person or a physical probe of any body cavity." Although Peters contends that she was forced face down on a concrete bunk by three officers, including two male officers, and that her clothes were removed from her with sufficient force to rip some of them, Peters has failed to generate any genuine issues of material fact that she was subjected to any "inspection" of her private parts or any "physical probe of any body cavity," as required for the Defendant Officers' conduct to be a "strip search" within the meaning of § 702.23. *See Torgerson*, 643 F.3d at 1042-43 (explaining that, in response to a motion for summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial"). Specifically, Peters cites to no portion of the record indicating that any officer inspected—or even saw—her private parts, and no portion of the record indicating that any officer physically probed any of her body cavities. Forcibly removing her clothes does not make the incident a "strip search" under this state statute.

Perhaps more importantly, the Supreme Court and the Eighth Circuit Court of Appeals have repeatedly recognized that federal courts "'d[o] not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment.'" *United States v. Burtton*, 599 F.3d 823, 828 (8th Cir. 2010) (quoting *United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995)); *accord United States v. McIntyre*, 646 F.3d

1107, 1113 ("'[S]tate law violations do not necessarily offend the Federal Constitution." (quoting *Burtton*, 599 F.3d 828)); *Rose v. City of Mulberry, Ark.*, 533 F.3d 678, 680 (8th Cir. 2008) ("'Just as a search authorized by state law may be an unreasonable one under [the Fourth Amendment], so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.'" (quoting *Cooper v. California*, 386 U.S. 58, 61 (1967)). Thus, IOWA CODE § 702.23 does not establish that Peters was subjected to a "strip search," let alone that she was subjected to an "unreasonable" invasion of her Fourth Amendment privacy rights.

On the other hand, Peters has generated genuine issues of material fact that the Defendant Officers engaged in a "strip search" within the broadest definition of that "imprecise term" identified in *Florence*—that is, that she was "instruct[ed] to remove clothing while an officer [female Officer Risdal] *observe[d]* from a distance of, say, five feet or more." *Florence*, ___ U.S. at ___, 132 S. Ct. at 1515 (emphasis added). This conclusion does not mean, however, that Peters has established that the search required "reasonable suspicion" to satisfy the Fourth Amendment "reasonableness" standard.

Specifically, the decision in *Florence* addressed only the kind of "strip search" involving the next higher degree of intrusion, "visual search procedures" involving "visual *inspection* from a closer, more uncomfortable distance [than five feet]." *Id*. at 1515 (majority opinion) (emphasis added), 1522-24 (separate concurring opinions). Justice Kennedy, writing for the plurality in Florence, not only distinguished this kind of search from more "invasive" searches, but from the less invasive instruction to remove clothing while an officer *observes* from a distance of, say, five feet or more, at issue here. *Id*. at 1522-23 (Kennedy, J., writing for the plurality). Similarly, Justice Alito, in his concurrence, described the "strip search" to which the Court's ruling in *Florence* applied as involving "visual *inspection*" of nude detainees, during which "the

arrestees may be required to manipulate their bodies." *Id.* at 1524 (Alito, J., concurring) (emphasis added). Again, Peters has not generated any genuine issues of material fact that she was subjected to any "visual *inspection*" of her naked body at all, which *might* have required "reasonable suspicion" even after *Florence*, where she cites to no portion of the record indicating that any officer inspected—or even saw—her private parts, or that she was ever required to manipulate her body, let alone that she was subjected to any of the "more invasive" kinds of conduct within the meaning of a "strip search" described in *Florence*, ___ U.S. at ___, 132 S. Ct. at 1515, to which "reasonable suspicion" might apply, at least under certain circumstances. In short, because the Court in *Florence* held that "reasonable suspicion" was not required for a *more invasive* search, "reasonable suspicion" was not required for the *less intrusive* impingement of Peters's privacy rights in this case, as a matter of law.

Furthermore, Peters has not identified any pre-*Florence* decision of the Eighth Circuit Court of Appeals requiring "reasonable" or "individualized" suspicion to justify a search involving no more than law enforcement officers' observation of an inmate changing clothes or law enforcement officers' merely incidental observation of an inmate's naked body or genitalia during such a change of clothes. *Compare Schmidt*, 557 F.3d at 572 (rejecting the notion that merely photographing a tattoo was equivalent to a "strip search," and unreasonable without "reasonable suspicion" that the arrestee was concealing contraband, because cases requiring "individualized suspicion" to justify a "strip search" "were much more intrusive"); *Richmond v. City of Brooklyn Center*, 490 F.3d 1002, 1005-06 (8th Cir. 2007) (noting that there was no dispute that officers had "reasonable suspicion" to perform a "strip search" involving pulling the arrestee's pants and underwear down and visually inspecting his genitalia and buttocks, without touching him). As explained, above, the pre-*Florence*, out-of-circuit decisions in *Kelsey*, 567 F.3d at 62-64, and *Stanley*, 337 F.3d at 967, specifically stand for the

proposition that a "clothing exchange" observed by an officer, even if it constitutes a "search," does not require "reasonable suspicion" to satisfy Fourth Amendment "reasonableness" standards.

Thus, I conclude that, as a matter of law, Peters was not subjected to a "strip search" or any other intrusion, however denominated, requiring "reasonable suspicion."

I acknowledge that Officer Risdal's insistence on observing the "clothing exchanges" implies, or raises genuine issues of material fact, that Officer Risdal's purpose was to watch over Peters to ensure that nothing illicit was brought into the jail—specifically, the strings of Peters's swimsuit top with which Officer Risdal believed that Peters might have been able to hurt herself—and that this is conduct that the Seventh Circuit Court of Appeals has described as a "search," albeit not a "strip search." *See Stanley*, 337 F.3d at 964. I also acknowledge that a "search" within the meaning of the Fourth Amendment occurs when "'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001)). This definition of "search" is not in terms of any particular *purpose* of the officers' conduct, or even any particular *conduct*, such as "inspecting" or even looking for anything, but is only in terms of "violation of a subjective expectation of privacy." Such a "violation of a subjective expectation of privacy" at least arguably occurs in any circumstances in which an arrestee or detainee is required to disrobe or is disrobed in front of others. In this specific sense, Peters has generated genuine issues of material fact that she was subjected to a "search" within the meaning of the Fourth Amendment.

Ultimately, however, as the parties argue, nomenclature is not the *legal* issue; the proper constitutional standard to evaluate Peters's claim is the *legal* issue. *Cf. Stanley*, 337 F.3d at 964 & n.2 (observing that "[w]hether we further label this process

a 'strip search' or merely a 'search' is unimportant, as the analysis remains the same," and that "[w]hether the procedure at issue here was a 'strip search' or just a 'search' more appropriately goes to the question of the scope or manner of the intrusion involved"). I agree. The proper constitutional standard here is a Fourth Amendment standard of "reasonableness," determined by "a balancing of the need for the particular [intrusion] against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559; *accord King,* ___ U.S. at ___, 133 S. Ct. at 1970 (explaining that the validity of a search of an individual taken into custody under the Fourth Amendment requires that courts "'balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable'" (quoting *Illinois v. McArthur*, 531 U.S. 326, 331 (2001)); *Florence*, ___ U.S. at ___, 132 S. Ct. at 1516 (citing *Bell*, 441 U.S. at 559, for this general Fourth Amendment standard); *Schmidt*, 557 F.3d at 572 (citing *Bell*, 441 U.S. at 559); *Stanley*, 337 F.3d at 964 (same). In the circumstances of this case, however, this standard for determining the "reasonableness" of a "search" does not require "reasonable suspicion."

For my part, I believe that describing the incident in which Peters was stripped as a "strip search" or even as a "search" is, at best, misleading, and at worst, invites jurors to decide the case on an improper, emotional basis. *See, e.g.,* FED. R. EVID. 403, and advisory committee comment. This is so, even if calling the incident at issue here a "search" is technically correct under the definition in *Arnzen*. *See* 713 F.3d at 372 (quoting *Kyllo*, 533 U.S. at 31–33). Specifically, I reiterate that Peters has failed to generate any genuine issues of material fact that she was stripped for the purpose of *inspecting* her naked body or genitalia for *concealed* contraband, rather than for the purpose of changing her into jail attire. *Cf. Schmidt*, 557 F.3d at 572 (rejecting the notion that merely photographing a tattoo was equivalent to a "strip search," because a "strip search" is "much more intrusive"); *Richmond*, 490 F.3d at 1005-06 (recognizing

conduct involving pulling the arrestee's pants and underwear down and visually inspecting his genitalia and buttocks, without touching him, as a "strip search"); *see also Kelsey*, 567 F.3d at 62-64. The record shows beyond dispute that the officers removed Peters's clothes only after Peters refused to answer the "suicide" questions, became disruptive, and refused to remove her clothes herself, not because they had any concern that she was *concealing* a weapon or other contraband, even if the parties dispute whether or not the Defendant Officers actually believed that Peters was a threat to herself. Moreover, the record shows beyond dispute that the officers involved in the incident attempted to cover Peters's body with a paper jumpsuit while the remainder of her street clothes (her swimsuit top and bottom) were removed by a female officer, even if the parties dispute the extent to which the paper jumpsuit effectively covered Peters's body, that the officers removed Peters's clothes while Peters was face down on a bunk, and that Peters has failed to generate any genuine issues of material fact that the Defendant Officers ever had a frontal view of her breasts and genitalia. Also, as noted twice before, Peters has not generated any genuine issues of material fact that she was subjected to any "visual inspection" of her naked body at all, where she cites to no portion of the record indicating that any officer inspected her naked body or inspected— or even saw—her private parts, or that she was ever required to manipulate her body, or subjected to any probe of her body cavities.

Although nomenclature is not the ultimate *legal* issue, it seems to me that a far less misleading description of Peters's claim in Count I—that is, one that recognizes both the conduct and the right at issue, without the potential for misleading the jurors or inviting a decision based on an emotional response—is "violation of privacy rights" protected by the Fourth Amendment or "intrusion on privacy" in violation of the Fourth Amendment, based on an "intrusion" rather than a "search." Such a description of this claim is consistent with *Hill v. McKinley*, 311 F.3d 899 (8th Cir.

2002), in which the Eighth Circuit Court of Appeals described claims that a female detainee was required to disrobe in the presence of a male officer, required to walk through the jail nude in the presence of male officers, and restrained nude on a restrainer board in the presence of male officers as claims of "violation of privacy rights" in violation of the Fourth Amendment. *See* 311 F.3d at 903. I will not insist upon the use of these labels for Peters's claim in Count I by all parties at all times from this point forward in the litigation, but I will use them in this decision.

### iii. Summary

As a matter of law, the applicable constitutional standard for Peters's claim of "violation of privacy rights" in Count I is a Fourth Amendment standard of "reasonableness," determined by "a balancing of the need for the particular [intrusion] against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. In the circumstances of this case, however, that standard does not require "reasonable suspicion" as a matter of law.

### c. Violation of the right

### i. Arguments of the parties

The defendants argue that, whatever the nature of the constitutional right involved in this claim, the answer to the first inquiry in the qualified immunity analysis—whether, taking the facts in the record in the light most favorable to Peters, there was a violation of her rights—is "no." More specifically, the defendants argue that the Defendant Officers were justified by interests in jail security and safety in requiring Peters to change her clothing and that no "reasonable suspicion" was required. They argue that the legitimate motivating factor for removing Peters's clothing was a concern that she could possibly hurt herself, where she refused to answer the "suicide" questions and presented herself in an uncontrolled and disruptive manner by screaming at officers. They point out that the Defendant Officers testified

that they understood that detainees could use strings on clothing to hurt themselves or to attempt to commit suicide, so that they were justified in removing Peters's swimsuit top, which had such strings, and that Officer Risdal was justified in insisting that she remain in the cell while Peters changed, in order to maintain security and safety.

The defendants also argue that the search was conducted in a reasonable manner, to protect Peters's safety, given Peters's emotional and aggressive demeanor. They point out that Officer Risdal first requested that Peters remove her clothing to change into jail garb, and only when Peters refused Officer Risdal's lawful and reasonable order to do so in Officer Risdal's presence and acted aggressively towards Officer Risdal was force used by the Defendant Officers to remove Peters's clothing. The defendants also argue that the assistance of the male officers was reasonably necessary to enforce Officer Risdal's order and that none of the male officers observed Peters's private body parts.

In response, Peters argues that, at a minimum, she has generated genuine issues of material fact that her Fourth Amendment rights were violated by the forcible removal of her swimsuit in the presence of male and female officers. She argues that her "strip search" required "reasonable suspicion," an argument that I rejected, above. Assuming a "fallback" position, that only a more general *Bell* standard is applicable, Peters asserts that the Defendant Officers lacked any legitimate justification for the "strip search." This is so, Peters argues, because the defendants have admitted that there were only two reasons for officers to watch a detainee undress: (1) suspicion that the detainee was concealing contraband or a weapon and needed to be strip-searched; and (2) concern that the detainee was a suicide risk and needed to be placed in a paper suit, but as to the second justification, the only one asserted here, Peters argues that the record here does not support that justification.

Specifically, Peters argues that her allegedly "belligerent" behavior did not demonstrate that she was a "suicide risk"; the booking form did not indicate any tearfulness, need for medical attention, violent, anxious, or embarrassed behavior, or any other behavior suggesting a risk of suicide; and that, although the booking form was changed after the incident in which she was stripped, it was only changed to indicate that the reason for placing her in a paper suit was that she was "belligerent," not that she was "suicidal." She also points out that she yelled at the Defendant Officers, "Why the fuck would I wanna hurt myself?" which the Defendant Officers have admitted is a negative answer to the question about whether she wanted to hurt herself. She also contends that the record shows that it was a foregone conclusion that she was never going to be allowed to change into jail attire in private. She also contends that the record shows that the required checks, at required intervals, on the condition of a "suicidal" detainee were not conducted in her case.

Peters also contends that the "search" was conducted in an unnecessarily abusive manner in the presence of male officers who physically restrained her. Peters denies that she engaged in any sufficiently aggressive or disruptive behavior to warrant being forcibly stripped and restrained by and in the presence of male officers.

In reply, the defendants reiterate that "reasonable suspicion" was not required and that the forcible removal of Peters's clothing was legitimately motivated by a concern that she might hurt herself with the strings of her swimsuit. They argue that it would have been unreasonable for them to "wait and see" if an emotional and disruptive detainee would actually attempt to harm herself before removing clothing with which she could do so. They contend that requiring inmates to disrobe, even in front of officers of the opposite sex, in order to change into jail attire is not necessarily unreasonable in manner, and that it was not unreasonable here.

### ii. Analysis

The first inquiry in the qualified immunity analysis is whether, taking the facts in the record in the light most favorable to Peters, there was a violation of her rights. *See Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 ("Evaluating a claim of qualified immunity requires a 'two-step inquiry:  (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted)); *accord Pearson*, 555 U.S. at 232.  Thus, as explained, above, I must consider whether the factual record, viewed in the light most favorable to Peters, supports a conclusion that the Defendant Officers violated Peters's constitutional rights.  *SL ex rel. Lenderman*, 725 F.3d at 850.  This question, of course, is answered by applying the "reasonableness" standard determined just above, involving "a balancing of the need for the particular [intrusion] against the invasion of personal rights that the search entails," *Bell*, 441 U.S. at 559, or at least, on a motion for summary judgment, determining whether there are genuine issues of material fact on this inquiry.  For the reasons explained above, "reasonable suspicion" is not part of the inquiry or a requirement for "reasonableness" in this case, however.

Determination of the "need for the particular intrusion" requires consideration of the following factors:

> (1) the justification for initiating the [intrusion], (2) the scope of the particular intrusion, (3) the place in which the [intrusion] is conducted, and (4) the manner in which it is conducted. [*Bell*,] 441 U.S. at 559, 99 S.Ct. 1861.

*Schmidt*, 557 F.3d at 572.  "These factors are used to balance the need for a particular [intrusion] with the rights of the individual [subjected to the intrusion]."  *Id.* (citing

*Bell*, 441 U.S. at 559).  As to "the rights of the individual," the Supreme Court recently reiterated,

> The expectations of privacy of an individual taken into police custody "necessarily [are] of a diminished scope." *Bell*, 441 U.S., at 557, 99 S.Ct. 1861. "[B]oth the person and the property in his immediate possession may be searched at the station house." *United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). A search of the detainee's person when he is booked into custody may "'involve a relatively extensive exploration,'" *[United States v.] Robinson*, 414 U.S. [218,] 227, 94 S.Ct. 467 [(1973)], including "requir[ing] at least some detainees to lift their genitals or cough in a squatting position," *Florence*, 566 U.S., at ––––, 132 S.Ct., at 1520.

*King*, ___ U.S. at ___, 133 S. Ct. at 1978.  Nevertheless, the Supreme Court has also stated that it "do[es] not underestimate the degree to which [highly invasive intrusions] may invade the personal privacy of inmates." *Bell*, 441 U.S. at 560.

In deciding whether Peters has generated genuine issues of material fact that there was insufficient "need for the particular [intrusion]" to outweigh her privacy interests, I must first consider "the justification for initiating the [intrusion]." *Schmidt*, 557 F.3d at 572 (identifying pertinent factors).  The defendants assert that the justification for forcibly changing Peters out of her swimsuit and into jail attire was to protect her from self-harm.  The defendants point to evidence that Peters refused to answer the "suicide" questions and, instead, became tearful, belligerent, and aggressive, so that Officer Risdal legitimately believed that Peters might pose a threat of harming herself, which required removal of Peters's clothing in Officer Risdal's presence.  Peters does not dispute that protecting a detainee from self-harm is a legitimate justification for an officer's conduct, but she disputes that it was the *actual* justification in this case.  She argues that the record belies this justification, because her booking intake form did not indicate any of the indicia of suicidal tendencies; that, even

after the incident, the booking form was not changed to indicate that she was placed in a paper suit because she was suicidal, but because she was "belligerent"; and that the checks, at specified intervals, on the condition of a potentially suicidal detainee, as required by jail policy, were not conducted in her case, according to jail records and the videotape of the detention area.

I conclude that, notwithstanding the evidence identified by Peters concerning the *post*-incident conduct of the Defendant Officers, no reasonable juror could conclude that, *at the time of the forcible removal of Peters's swimsuit*, doing so was *not* because of a concern that Peters needed to be protected from *potentially* harming herself with the strings on her swimsuit. *Torgerson*, 643 F.3d at 1042-43 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (internal quotation marks and citations omitted). Peters has pointed to nothing in the record that undermines Officer Risdal's testimony that, where a detainee refuses to answer the "suicide" questions, the detainee must be *treated* as posing a potential for self-harm, and that the detainee's street clothing must be removed in an officer's presence to minimize that potential. Nor has Peters pointed to anything in the record that undermines Officer Risdal's testimony that her belief that she was required to treat Peters as posing a risk of self-harm was the motivation for Officer Risdal's order for Peters to remove her street clothes in Officer Risdal's presence. Thus, this factor, "the justification for initiating the [intrusion]," *Schmidt*, 557 F.3d at 572, shows only that there was sufficient (or at least "objectively reasonable") "need for the particular intrusion."

As to the *third* factor, "the place in which the [intrusion] is conducted," *id.*, Peters does not complain that the intrusion occurred in a holding cell. Rather, she complains about the presence of the Defendant Officers, male and female, and the forcible removal of her clothing, which are matters going to the *second* and *fourth*

factors, "the scope of the particular intrusion" and "the manner in which it was conducted." *Id.*

The "scope" of the intrusion, *to the extent that it involved removal of Peters's clothes,*[13] was relatively small. As I have noted repeatedly, above, the record shows beyond dispute that the officers involved in the incident attempted to cover Peters's body with a paper jumpsuit while the remainder of her street clothes (her swimsuit top and bottom) were removed by a female officer, even if the parties dispute the extent to which the paper jumpsuit effectively covered Peters's body, and there is no dispute that the officers removed Peters's clothes while Peters was face down on a bunk, concealing her breasts and genitalia from a frontal view. Also, Peters has not generated any genuine issues of material fact that she was subjected to any "visual inspection" of her naked body at all, where she cites to no portion of the record indicating that any officer (male or female) inspected her naked body or inspected—or even saw—her private parts; she cites no portion of the record indicating that she was ever required to manipulate her body; and she cites no portion of the record indicating that she was subjected to any inspection or probing of her body cavities. Thus, this incident falls at the less-intrusive or less-invasive end of the spectrum for the "scope" of the intrusion. *Cf., e.g.*, *Florence*, ___ U.S. at ___, 132 S. Ct. at 1522-23 (Kennedy, J., writing for the plurality) (distinguishing this kind of search from more "invasive" searches). Certainly, the intrusion here did not involve any visual body-cavity searches of detainees, which the Supreme Court has held were *not* unreasonably invasive in *Bell*,

---

[13] Again, this is the extent of the "scope" of the intrusion involved in Peters's "violation of privacy rights" claim, as I have construed that claim. *See*, *supra*, beginning at page 44.

441 U.S. at 558-59. Thus, no reasonable juror could find, on this record, that the "scope" of the intrusion undermines the "need for the intrusion."

Peters argues that she has, nevertheless, pointed to record evidence from which reasonable jurors could find that there was relatively less need for conducting the intrusion in the "manner" in which it was conducted. *See Schmidt*, 557 F.3d at 572. I disagree. Again, I construe this "violation of privacy rights" claim to be limited to the presence of officers (male and female) and the forcible removal of Peters's swimsuit, without encompassing the degree of force used to effect the removal of Peters's swimsuit, a matter relevant to Peters's "excessive force" claim. *See, supra*, at page 44 (construing the scope of the conduct at issue in the "violation of privacy" and the "excessive force" claims). The "manner" of the intrusion in Peters's case does not present a jury question—that is, a question as to how the jurors will weigh the "manner" of the intrusion in the "need for the intrusion" analysis—even though Peters's swimsuit was indisputably forcibly removed from her in the presence of male officers. Peters has cited no authority and no facts in the record that would have suggested that an objectively reasonable officer would not have acted promptly to compel Peters's compliance with the order to remove her clothing, where the officers objectively reasonably believed that Peters's swimsuit posed a potential threat of self-harm, in light of Peters's unruly, emotional, and aggressive conduct and her refusal to answer the "suicide" questions. Peters also has not pointed to any authority or facts in the record suggesting that it would have been "objectively reasonable" to wait until additional officers of the same sex could come to Officer Risdal's assistance before forcibly removing Peters's swimsuit. Indeed, the law is to the contrary. *See Hill*, 311 F.3d at 903 ("[W]e cannot say in light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female

prisoner to disrobe in his presence before placing her in a padded cell for her own safety.").

Thus, Peters has failed to generate genuine issues of material fact that there was no "need for the intrusion," such that it weighs against the "objective reasonableness" of the Defendant Officers' conduct at issue in Peters's "violation of privacy rights" claim; to the contrary, no reasonable juror could find that the intrusion was not substantially justified.

Next, the factors going to the "need for a particular [intrusion]" must be balanced against "the rights of the individual [subjected to the intrusion]." *Schmidt*, 557 F.3d at 572. As noted above, "[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope," *King*, ___ U.S. at ___, 133 S. Ct. at 1978 (with internal quotation marks, citations, and alterations omitted), but the Supreme Court "do[es] not underestimate the degree to which [highly invasive] searches may invade the personal privacy of inmates." *Bell*, 441 U.S. at 560. Here, no reasonable juror could find that the relatively slight invasiveness of the substantially justified intrusion in this case—which involved no inspection of Peters's naked body or genitalia and no probing of her body cavities—was conducted in an objectively unreasonable manner, even though it involved the forcible removal of Peters's clothing in the presence of male officers, such that it was contrary to a detainee's reduced expectations of privacy.

### iii.    *Summary*

In short, Peters has not generated genuine issues of material fact on the balancing of the pertinent factors that must be considered on her "violation of privacy rights" claim in Count I. Therefore, she also has not generated genuine issues of material fact on the first prong of the "qualified immunity" analysis of this claim,

whether her rights were violated. *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3; *accord Pearson*, 555 U.S. at 232.

### d.    *"Clearly established" right*

Notwithstanding that Peters has not generated genuine issues of material fact on the "violation of rights" prong of the "qualified immunity" analysis, I will consider, in addition or in the alternative, the second prong of "qualified immunity" analysis, which asks "'whether that right was clearly established at the time of the defendant's alleged misconduct,'" *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted)); *accord Pearson*, 555 U.S. at 232, assuming, for the sake of argument—and contrary to my conclusion above—that Peters *has* generated genuine issues of material fact on the "violation of rights" prong of the "qualified immunity" analysis. This is a question of law for the court to decide. *Bishop*, 723 F.3d at 961. The parties dispute the appropriate answer to this second question in the circumstances of this case.

### i.    *Arguments of the parties*

The defendants argue that, whatever the answer to the first question concerning qualified immunity, the answer to the second question, asking whether the right in question was "clearly established," is "no." They argue that, in light of the "abundance" of authority upholding "clothing exchange" procedures, it would not have been clear to any of the Defendant Officers that their actions were unlawful. A detainee's right to change into jail garb without being observed by law enforcement officials, including law enforcement officials of the opposite sex, the defendants argue, was not sufficiently clear that every reasonable officer in their position would have understood that he or she was violating Peters's privacy rights. The defendants argue that any mistake by the Defendant Officers was well within the bounds of reason, for

example, in light of the decision of the Eighth Circuit Court of Appeals in *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002).

Peters counters that the Defendant Officers reasonably should have known that they were violating her privacy rights, because they lacked any legitimate reason for forcibly removing her clothes and they knew that they were conducting the intrusion in an unreasonable manner. Peters also contends that the Defendant Officers lacked "reasonable suspicion," so that they should have known that they were violating her privacy rights.

In reply, the defendants reiterate that a right is not "clearly established" if it is supported only by broad generalizations about prohibitions of intrusions on privacy; specificity of the prior articulation of the right is required. They argue that it was not clear that jailers could not require pretrial detainees to disrobe in front of them as part of a "clothing exchanges" or when a pretrial detainee posed a threat of self-harm. They also argue that their beliefs that Peters was a danger to herself and that forcibly removing her clothing was appropriate were "objectively reasonable," and that there was no "clearly established" law to the contrary. They also argue that the extent to which "reasonable suspicion" might be required was sufficiently "murky" in the months after the *Florence* decision, when the incident at issue occurred, that there was no "clearly established" right to a search only with "reasonable suspicion."

### ii.    *Analysis*

As explained in more detail, above, the point of the "clearly established right" inquiry in the qualified immunity analysis is to determine "'if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff[s].'" *Scott*, 720 F.3d at 1036 (quoting *Gordon*, 454 F.3d at 862, with alterations omitted, emphasis in original, and citations and internal quotation marks omitted). As a matter of law, the

Defendant Officers neither knew nor reasonably should have known that their actions would violate Peters's privacy rights. *Scott*, 720 F.3d at 1036; *Bishop*, 723 F.3d at 961 (explaining that whether a constitutional right at issue was "clearly established" is a question of law for the court to decide). This is a case in which it is plain that the specific constitutional right that Peters asserts was not "clearly established," even if there was such a right. *Cf. Pearson*, 555 U.S. at 236-37.

Peters contends that protecting her from self-harm was not the actual justification for forcibly stripping her of her swimsuit, in light of the post-intrusion failure to change the booking form to reflect a concern about self-harm as the reason for changing Peters into a paper suit and the post-intrusion failure to check her condition at the time intervals required by jail policy for a detainee believed to be suicidal. Nevertheless, as the defendants contend, given Peters's emotional state and her failure to answer the "suicide" questions, at the time that Peters was stripped of her swimsuit, it was not "clearly established" that a reasonable officer would have allowed Peters to remain in a cell with articles of clothing that she could potentially use to harm herself. Also, as the defendants contend, it was not "clearly established" that, once it became clear that Peters was not going to change into jail attire voluntarily, a reasonable officer could not compel compliance with the order and must, instead, just allow Peters to remain in a cell with the stringed clothing with which she could harm herself.

More specifically, as to the issue of whether the right was "clearly established," subsequent conduct of the Defendant Officers does nothing whatever to show that there was a "clearly established" right to be free from forcible removal of street clothes, in the presence of officers of the opposite sex, when a detainee's conduct at the time of the removal, viewed objectively, indicates a *potential* threat of self-harm. *Scott*, 720 F.3d at 1036 (defining when a right is "clearly established"). As I pointed out, above, as to the "justification" factor in the "need for the intrusion" analysis, Peters has pointed to

nothing in the record that undermines Officer Risdal's testimony that, where a detainee refuses to answer the "suicide" questions, the detainee must be *treated* as posing a potential for self-harm, and that the detainee's street clothing must be removed in the officers' presence to minimize that potential, or that undermines Officer Risdal's testimony that it was this requirement to treat Peters as posing a risk of self-harm that motivated Officer Risdal's order for Peters to remove her street clothes in Officer Risdal's presence.

Nevertheless, Peters relies on a statement by the Eighth Circuit Court of Appeals that, at least as of April 2001, "[t]he law was . . . clear that strip searches should be conducted by officials of the same sex as the individual to be searched." *See Richmond v. City of Brooklyn Center*, 490 F.3d 1002, 1008 (8th Cir. 2007). Peters has also pointed to record evidence suggesting that her conduct was, at least arguably, less violent and disruptive than the conduct of the detainee in *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), so that the presence of male officers and the forcible removal of her clothing was contrary to "clearly established" law.

I conclude that *Richmond* does not state an absolute rule that it is *never* appropriate for officials of the opposite sex to be present while a detainee's clothing is removed for a legitimate reason. That decision states only that the law was clear that removal of a detainee's clothing "should" be conducted by officers of the same sex, the "strip search" in that case was actually performed by officers of the same sex, and there were apparently no circumstances in that case that required a discussion of when the presence of officers of the opposite sex would be warranted. *See Richmond*, 490 F.3d at 1008 (finding that the search *did* comply with "clearly established" law).

Moreover, the defendants are correct that the presence of male guards and even the forcible removal of a female detainee's street clothes do not necessarily mean that

the intrusion was conducted in a manner contrary to "clearly established" law. As the
Eighth Circuit Court of Appeals explained in *Hill*,

> With respect to Hill's first claim, [that she was
> required to disrobe in the presence of a male officer,] the
> parties dispute which guard required Hill to disrobe when
> she was placed in the padded cell. . . .   The jury was
> entitled to credit Hill's testimony that it was a male guard
> who required her to disrobe. Even if it was a male guard,
> however, we cannot say in light of precedent that it is a
> violation of a prisoner's Fourth Amendment privacy rights
> for a male guard to require a loud and violent female
> prisoner to disrobe in his presence before placing her in a
> padded cell for her own safety. [Citations omitted.]

*Hill*, 311 F.3d at 903.   There is no indication that the detainee in *Hill* completely
refused to remove her clothing, as Peters did, so that the reasonableness of forcibly
removing the detainee's clothing was never an issue in *Hill*, although the detainee in
*Hill* refused to wear a paper gown after disrobing, including while being transferred to
a padded cell. *Id.* at 901.

Peters has pointed to no case that "clearly establishes" that the forcible removal
of a detainee's clothing, in the presence of guards of the opposite sex, is *never*
permissible, or even a case that distinguishes when forcible removal of a detainee's
clothing, in the presence of guards of the opposite sex, might be permissible from when
it clearly would not be.   The defendants are correct that a "generalized right" is not
sufficient to "clearly establish" the specific right on which the victim's claim hangs for
purposes of qualified immunity.   *al-Kidd*, ___ U.S. at ___, 131 S. Ct. at 2083; *accord
Mettler v. Whitledge*, 165 F.3d 1197, 1202-03 (8th Cir. 1999) (citing *Anderson v.
Creighton*, 483 U.S. 635, 639 (1987)).   As the defendants point out, *Hill* and the out-
of-circuit "clothing exchange" cases, *Kelsey* and *Stanley*, would have suggested to a
reasonable officer that requiring a detainee to disrobe, and even forcibly removing a

non-compliant detainee's clothing, was reasonable, even in the presence of officers of the opposite sex.

Finally, even if *Peters* is correct that the decision in *Florence* simply clarified when "reasonable suspicion" was required for the removal of her clothing in the presence of officers of the opposite sex, it was not so "clearly established," in the months after *Florence* was decided, that any reasonable officer would have known or should have known there was a "reasonable suspicion" requirement in this case. *Scott*, 720 F.3d at 1036. While Peters contends that pre-*Florence* precedent clearly required "reasonable suspicion" for "strip searches," it was not clear either that Peters was subjected to a "strip search" or that "reasonable suspicion" was required for the kind of "search" at issue here. Peters has not identified any pre-*Florence* decision of the Eighth Circuit Court of Appeals requiring "reasonable" or "individualized" suspicion to justify a search involving no more than law enforcement officers' observation of an inmate changing clothes or law enforcement officers' merely incidental observation of an inmate's naked body or genitalia during such a change of clothes. *Cf. Schmidt*, 557 F.3d at 572 (rejecting the notion that merely photographing a tattoo was equivalent to a "strip search," because a "strip search" is "much more intrusive"); *Richmond*, 490 F.3d at 1005-06 (recognizing conduct involving pulling the arrestee's pants and underwear down and visually inspecting his genitalia and buttocks, without touching him, as a "strip search"); *see also Kelsey*, 567 F.3d at 62-64. Also, as explained, above, the pre-*Florence*, out-of-circuit decisions in *Kelsey*, 567 F.3d at 62-64, and *Stanley*, 337 F.3d at 967, specifically stand for the proposition that a "clothing exchange" observed by an officer, even if it constitutes a "search," does not require "reasonable suspicion" to satisfy Fourth Amendment "reasonableness" standards.

In short, the answer to the second qualified immunity question on this claim, whether the right was "clearly established," is "no."

### e.    Summary

The answer to both questions in the qualified immunity analysis on Peters's "violation of privacy rights" claim in Count I, whether Peters's rights were violated and whether that right was "clearly established" at the time of the defendants' alleged misconduct at issue in this claim, is "no." Therefore, the Defendant Officers are entitled to qualified immunity on this claim. *See Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (so framing the second question in the qualified immunity analysis and explaining that, unless the answer to both questions is "yes," the defendant officers are entitled to qualified immunity). Thus, the defendants are entitled to summary judgment on the claim of "violation of privacy rights" in Count I of Peters's Amended Complaint on the basis of qualified immunity.

### 3.    The "excessive force" claim

Next, the defendants assert that they are entitled to summary judgment, on "qualified immunity" grounds, on Peters's "excessive force" claim in Count III. As I explained, *supra*, on page 45, I construe Peters's "excessive force" claim in Count III as involving the question of the reasonableness of the force actually used to effect removal of Peters's swimsuit. I will consider the two prongs of the "qualified immunity" analysis in turn as to this claim, but I must first determine the source of the right at issue in this claim.

### a.    Source of the right

Although the parties do not raise an argument concerning the constitutional source of Peters's "excessive force" claim, I find that this question is at least as relevant to Peters's "excessive force" claim in Count III as it was to her "violation of privacy rights" claim in Count I. This is so, because the Eighth Circuit Court of Appeals has "noted the existence of a 'legal twilight zone' between arrest and sentencing, where it is unclear whether excessive force claims are governed by the

Fourth Amendment or cases decided based on the Fourteenth Amendment and substantive due process." *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (quoting *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir.2000)).

Notwithstanding the existence of this "legal twilight zone,"

> [The Eighth Circuit Court of Appeals] has ruled . . . that it is appropriate to use a Fourth Amendment framework to analyze excessive force claims arising out of incidents occurring shortly after arrest, apparently because those incidents still occur "in [the] course of" a seizure of a free citizen. *See Moore v. Novak*, 146 F.3d 531, 535 (8th Cir.1998). In particular, *we have applied Fourth Amendment excessive force standards to incidents occurring during the transportation, booking, and initial detention of recently arrested persons. See Wilson*, 209 F.3d at 715–16; *Moore*, 146 F.3d at 535; *Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir.1997).

*Chambers*, 641 F.3d at 905 (emphasis added). Other decisions of the Eighth Circuit Court of Appeals also clearly support application of a Fourth Amendment standard— considering the "objective reasonableness" of an officer's conduct—to an "excessive force" claim arising during the booking process. *See Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) ("It is settled in this circuit that the Fourth Amendment's 'objective reasonableness' standard for arrestees governs excessive-force claims arising during the booking process." (citing *Wilson*, 209 F.3d at 716)), and *Moore*, 146 F.3d at 535)); *Wilson*, 209 F.3d at 715 (explaining that, in the "legal twilight zone" between arrest and sentencing, it would apply a Fourth Amendment "objective reasonableness" standard, because "if [the arrestee, who alleged excessive force during the booking process] cannot win his case under Fourth Amendment standards, it is a certainty he cannot win it under the seemingly more burdensome, and clearly no less burdensome, standards that must be met to establish a Fourteenth Amendment substantive due process claim [requiring a 'shock the conscience' standard]."); *and compare Andrews*

74

*v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001) ("The evaluation of excessive-force claims brought by pretrial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard." (citing *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1048–49 (8th Cir. 1989)).

Thus, while the constitutional *source* of the right at issue on an "excessive force" claim arising during booking or initial detention is not altogether clear, the *standard* for such a claim under Eighth Circuit precedent is clearly one of "objective reasonableness" analogous to a Fourth Amendment standard.

### b.     Violation of the right

The parties dispute whether Peters's right to be free from the use of "excessive force" was violated.  Therefore, I turn to a summary of their arguments concerning this first step in the qualified immunity analysis.  *See Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (explaining that the two steps in the inquiry to evaluate qualified immunity are the following:  "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct" (internal quotation marks and citations omitted)).

### i.     Arguments of the parties

The defendants argue that the Defendant Officers did not violate Peters's Fourth Amendment rights by using "excessive force," because the force used to effect the removal of Peters's swimsuit was "objectively reasonable" in the circumstances presented.  They argue that Peters was emotional and upset, refused to answer the "suicide" questions, became angry and aggressive, and refused to comply with a lawful and reasonable order to change into a jail jumpsuit in the presence of Officer Risdal, a female officer, making the use of force reasonable and appropriate.  They argue that,

contrary to Peters's contentions, photographs taken after the incident do not reveal any significant trauma to Peters's face, so that the "result of the force" or the "extent of the suspect's injuries" do not suggest the use of "excessive force."

Peters responds that she had been arrested for a simple misdemeanor, a minor offense posing no threat of violence to anyone, and that the defendants have not explained how her crying somehow justified their use of force. She argues that nothing about her conduct suggested that she posed an immediate risk of safety to the Defendant Officers or others. She also disputes that her conduct suggested that she posed a risk of self-harm or suicide and that record evidence undermines the Defendant Officers' contention that concerns that she might harm herself justified stripping her in the first instance. Peters also argues that the record evidence does not indicate that she was actively resisting the Defendant Officers. She contends that her initial refusal to disrobe in front of Officer Risdal did not warrant throwing her on a concrete bunk, bashing her head into a concrete wall, and ripping off her clothes as she "screamed in pain." She also contends that Jail Administrator Phillips, who is not a defendant, admitted in her deposition that the booking photographs, taken the day after the incident, do show injuries to Peters's face and head; that the medical intake form does not indicate any pre-existing facial injury; that Peters's treating physician observed a subconjunctival hemorrhage on her right eye, bruising on her right temple area and arm, and tenderness over her left jaw and the back of her head; and that her treating physician diagnosed Peters with concussion, assault, and facial contusions, consistent with Peters's claims of the officers bashing her against hard surfaces. Thus, Peters contends that the record evidence supports an inference that the force used was excessive.

###### ii.     *Analysis*

The Eighth Circuit Court of Appeals has identified various principles for the application of the "objective reasonableness" standard for claims of "excessive force" during booking or pre-trial detention.  In *Chambers v. Pennycock*, 641 F.3d 898 (8th Cir. 2011), a case in which an arrestee asserted "excessive force" claims based on both the force used to arrest him and the force used against him during a post-booking trip to the hospital, the court observed,

> An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [*Graham v. Connor*, 490 U.S. 386,] 396-97, 109 S.Ct. 1865 [(1989)]. The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

*Chambers*, 641 F.3d at 905-06; *Hicks*, 640 F.3d at 842 (observing, in a case involving a claim of "excessive force" arising from the booking process, "Under this [Fourth Amendment 'objective reasonableness'] analysis, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  (citing *Wilson*, 209 F.3d at 716, in turn quoting *Graham*, 490 U.S. at 396)).  The court has also explained, "'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Wilson*, 209 F.3d at 716 (quoting *Graham*, 490 U.S. at 396–97).

At a more concrete level, in *Hicks v. Norwood*, 640 F.3d 839 (8th Cir. 2011), in order to determine whether "excessive force" had been used against a pretrial detainee, the Eighth Circuit Court of Appeals considered the "objective reasonableness," under the circumstances, of both (1) the officer's decision to use force, and (2) the amount of force used against the detainee. *Hicks*, 640 F.3d at 842. Various factors may inform these two prongs of the analysis. I will consider in turn the factors relevant here.

First, however, one factor that plainly is *not* relevant to the "objective reasonableness" analysis is *an officer's mental state*. As the Eighth Circuit Court of Appeals has explained,

> "'[T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" [*Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir.), *cert. denied*, 546 U.S. 957 (2005)] (quoting *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1980)).

*Hayek v. City of St. Paul*, 488 F.3d 1049, 1054 (8th Cir. 2007). To put it another way, "a pure heart will not make unreasonable acts constitutional, nor will malice turn a reasonable use of force into a violation of the Fourth Amendment." *Wilson*, 209 F.3d at 716 (citing *Graham*, 490 U.S. at 397). Thus, the fact that an officer who used force against a detainee may have been angry with the detainee, or even that the officer had threatened the detainee, does not preclude summary judgment on qualified immunity grounds on the detainee's "excessive force" claim, because the officer's "mental state is not relevant to the objective reasonableness of his actions." *Id.* at 717.

Peters asserts that the Eighth Circuit Court of Appeals has identified *the severity of the crime* as a factor that is relevant to the reasonableness of an officer's use of force, citing *Howard v. Kansas City Police Dep't.*, 570 F.3d 984, 989 (8th Cir. 2009). Peters argues that she was arrested only for a minor, non-violent simple misdemeanor

that posed no threat of violence to anyone, which she apparently argues suggests that the use of force against her was unreasonable. For the reasons stated below, I question the relevance, in this case, of "the severity of the crime" for which Peters was detained, because it appears to me that this factor is more instructive in an "excessive force" case involving the reasonableness of the force used *to effect an arrest* than it is in a case involving the reasonableness of the force used against a detainee *in the course of detention*.

Peters is correct that, in *Howard*, the Eighth Circuit Court of Appeals explained that courts look at factors including "'the severity of the crime at issue'" in determining whether the force used to effect a particular "seizure" was "reasonable," in the totality of the circumstances. 570 F.3d at 989 (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004)). In *Howard*, the plaintiff, a shooting victim who sought aid from the police, was restrained shirtless on hot asphalt, initially for the purpose of ascertaining his role in the incident and whether he was armed, then for the purpose of rendering him medical aid. 570 F.3d at 988. The court first determined that the officers had "seized" the plaintiff, within the meaning of the Fourth Amendment, even though he was not "a suspect" in the shooting incident "in the traditional sense," "by restraining [the shooting victim] for the purpose of rendering medical aid and by actively preventing him from moving off the asphalt." *Id*. at 989.

Identification of the "severity of the crime" as a factor in *Howard* is not helpful in Peters's case, for at least three reasons. First, the circumstances in *Howard* did not involve the reasonableness of the use of force in an incident during detention, but the reasonableness of the use of force in the "seizure" of a shooting victim at the time of the incident. Second, the "severity of the crime" was part and parcel of the incident in which force was initially used against the plaintiff:

> Initially, the Officers were justified in drawing their weapons and forcing Howard to the ground upon arriving at the scene. The Officers were aware there was a shooting and a high-speed car chase, and, even though Howard approached them trying to get their assistance, it was necessary for the Officers to ensure their safety until they could ascertain Howard's role in the incident and determine whether he was armed.

*Howard*, 570 F.3d at 989.

Third, and most importantly here, in *Howard*, "the severity of the crime" ceased to be relevant in the court's analysis of the "objective reasonableness" of the officers' subsequent use of force:

> It was the Officers' actions after forcing Howard to the ground, however, that were objectively unreasonable. Once Howard was on the ground, it was apparent to the Officers that he was a victim of an attack and not a suspect, that he was unarmed, and that he was not attempting to flee, resist, or harm the Officers. While the Officers initially acted reasonably in administering first aid, Howard soon thereafter began complaining that the asphalt was burning his exposed skin. Howard asked to await an ambulance while leaning on a police cruiser or while lying on a nearby patch of grass; the Officers denied both requests. In spite of Howard's constant complaints, it took the Officers four to six minutes before they responded and ordered someone to retrieve a blanket, which they then placed underneath him. Moreover, not only did the Officers fail to act in response to Howard's complaints, they affirmatively resisted his attempts to move his exposed skin off the asphalt. The Officers were aware of the damage the asphalt was inflicting on Howard when he began to complain and move to free himself, and, instead of remedying the situation with reasonable dispatch, the Officers did nothing while Howard's injuries worsened. As a result, Howard received severe second-degree burns. Given Howard's persistent, specific complaints about the exposure of his exposed skin to

> hot asphalt on a day when the temperature exceeded 100
> degrees, a reasonable officer should have recognized the
> danger to Howard and responded appropriately. Instead,
> Officers Bronner and Sartain did nothing for four to six
> minutes except pin Howard's arms and legs to the ground in
> spite of his attempts to move his exposed skin off the
> asphalt. On this version of the facts, we conclude the
> Officers' actions were not objectively reasonable.

*Howard*, 570 F.3d at 990.

Thus, *Howard* can be read to stand for the proposition that "the severity of the crime" may cease to be a relevant factor in the "objective reasonableness" analysis of the use of force as circumstances change, or it can be read for the proposition that "the severity of the crime" may not be a relevant factor at all in some incidents in which force is used. That decision cannot be read to support the proposition that "the severity of the crime" is *always* relevant to the "objective reasonableness" analysis, and because it did not involve the use of force during detention, it cannot be read to support the proposition that "the severity of the crime" is a relevant factor in this case.

The decision in *Small v. McCrystal*, 708 F.3d 997 (8th Cir. 2013), also demonstrates that "the severity of the crime" is relevant to the "objective reasonableness" of the use of force *when the crime and the incident in which force is used are interwoven,* as they are when force is used to arrest a suspect of a crime. In *Small*, the court reiterated that "'the severity of the crime at issue'" was a relevant factor in the determination of the "objective reasonableness" of the force used to effect an arrest. 708 F.3d at 1005 (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). The court explained that, when determining the reasonableness of the force used to effect an arrest, "'[f]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public,'" *id.* (quoting *Brown*, 574 F.3d at 499). The

court then found that precisely the circumstances in which force was least justified were present in the case before it, because the defendant was charged with non-violent misdemeanors; he posed no immediate threat to the officers or others; he was walking away from the officers toward his trailer, but he was not in flight or resisting arrest; and the officers had not advised him that he was under arrest. *Id.* Thus, in *Small*, the court tied the severity of the crime to the conduct of the arrestee *at the time of the arrest*. The court held that use of more than *de minimis* force was unreasonable, and that the officer had acted unreasonably by running and tackling the defendant from behind without warning. *Id.* Again, *Small* was not a case involving the use of force in an incident during detention, so that it says nothing about the relevance of "the severity of the crime" to the "objective reasonableness" of the use of force in a case, like Peters's, where force was used in an incident during detention.

Other decisions of the Eighth Circuit Court of Appeals demonstrate clearly that "the severity of the crime" is not—or at least may not be—a relevant factor in the analysis of the "objective reasonableness" of the use of force during detention. For example, in *Moore*, in which a pretrial detainee asserted an "excessive force" claim arising from an incident during booking, not during his arrest, the court initially identified "the severity of the crime" as a factor relevant to the "objective reasonableness" of the use of force. 146 F.3d at 535. Nevertheless, in *Moore*, the court did not even mention the crime for which the detainee had been arrested when it actually considered the reasonableness of the use of force during a detention incident. Instead, the court noted that, *at the time of the booking incident*, the detainee "was intoxicated, agitated, refused to comply with commands, kicked the arresting officer, continued to struggle and attempt to get away, and posed an immediate threat to his own safety and to the safety of the officers," and concluded that the use of force—

including application of a stun gun, taking the detainee to the floor, and holding him there—was reasonable under the circumstances.  146 F.3d at 535-36.

Similarly, in *Hicks*, the court noted that the detainee had been arrested "on an active warrant," but never even identified the nature of the conduct that had prompted issuance of the warrant, nor mentioned "the severity of the crime" as a factor in its analysis of the reasonableness of the force used during a booking incident.  640 F.3d at 840.  In its analysis of the "objective reasonableness" of the force used in a booking incident, the court in *Hicks* again focused on the detainee's conduct *during the incident*, noting that he "refused to comply with directions [to change into a jail uniform], loudly abused the correctional officers, and aggressively leapt toward [the officer accused of using 'excessive force']," and the court concluded that using an "arm-bar maneuver" to take the detainee to the floor was reasonable under the circumstances.  *Id*. at 842.

It follows from these "excessive force" cases involving detainees that pre-trial detention for only a "minor" offense does not somehow limit the degree of force that may reasonably be used against a detainee in an incident arising during booking or initial detention, and Peters has cited no cases involving "use of force" incidents during detention so holding.  Indeed, *Moore* and *Hicks* suggest that even a detainee who was arrested for only a minor or non-violent offense might engage in conduct during the booking process or during detention that made the use of force—even very significant force—"objectively reasonable" to restrain the detainee or to compel the detainee's compliance with an officer's directive.

Thus, in cases in which an "excessive force" claim arises from an incident during detention, it is the detainee's conduct *at the time of the incident in which force was used*, not "the severity of the crime" for which the detainee was detained, that is relevant to a determination of the reasonableness of the decision to use force and the amount of force used.  This focus on the detainee's conduct at the time of the incident,

rather than "the severity of the detainee's crime," is entirely consistent with the observation in *Hicks* that the claim involves the "objective reasonableness" of "both [an officer's] decision to use force and the amount of force used . . . *under the circumst*ances." 640 F.3d at 842 (emphasis added); *accord Chambers*, 641 F.3d at 905-06 (explaining that the question is whether an officer's conduct "is objectively unreasonable, given the facts and circumstances of the particular case" (internal quotation marks and citations omitted)); *Hayek*, 488 F.3d at 1054 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." (internal quotation marks and citations omitted)).

Furthermore, I think it is likely, in this case, that it would be appropriate to exclude at trial—if there is a trial on this claim—any reference to the minor offense for which Peters was arrested. This is so, because reference to the minor offense for which Peters was arrested might mislead the jurors into believing that a minor offense reduces the amount of force that can reasonably be used against a detainee, without regard to the conduct of the detainee at the time of the incident in which force was used, which is the proper focus of their inquiry. *See* FED. R. EVID. 403 and advisory comments (relevant evidence may be excluded because of its potential to confuse or mislead the jury.[14]

---

[14] I acknowledge that there may be circumstances in which the severity and the nature of the crime for which a detainee has been detained would continue to be relevant to the reasonableness of the use of force in an incident during booking or pretrial detention—and might even suggest that the use of greater force sooner was appropriate—but those circumstances are likely to be ones in which the detainee's alleged crime was actually *so severe and/or so violent* that it would suggest that the detainee would continue to be a threat to officers or others during booking or detention. An officer's subjective belief that a particular detainee is "scary" or "dangerous," however, simply is not enough to warrant the use of any particular degree of force in

(Footnote continued . . . )

As the preceding discussion suggests, one factor that plainly *is* relevant to both prongs of the "objective reasonableness" analysis is *the conduct of the detainee during the incident*, such as the detainee's refusal to comply with directions; use of abusive language towards officers; aggressive conduct towards officers where reasonable officers could have believed that the detainee constituted a threat to the officers' safety; or conduct suggesting that the detainee was a threat to the safety of others or to the

---

any particular circumstances, because the officer's subjective state of mind is not relevant to the "objective reasonableness" analysis. *See Hayek*, 488 F.3d at 1054.

I also acknowledge that a detainee's arrest for only a minor, non-violent offense might be relevant to show that there was no basis for a decision to use force in an incident during booking or detention, *if* there was *no evidence* that the detainee engaged in any *conduct during the incident* that might have warranted a decision to use force. Evidence that the detainee was detained only for a minor, non-violent offense might then be relevant to eliminate any inference that the crime somehow demonstrated the reasonableness of continued concerns for the safety of officers or others during booking or detention, that is, it would be another factor suggesting that the use of force was merely "gratuitous." *Cf. Chambers*, 641 F.3d at 907-08 (holding that the use of force during transportation of the detainee to the hospital was merely "gratuitous," where the detainee did nothing during the trip to warrant the use of force). This is not such a case, however, as I will explain more fully in the body of this decision.

I will not explore in what circumstances the crime for which a detainee was detained might be relevant to the "objective reasonableness" analysis of the use of force during booking or detention, because Peters's detention for violating a no-contact order simply does not "objectively reasonably" suggest that she was the kind of detainee who posed a continuing threat to the safety of the Defendant Officers or others, any more than her arrest for a minor, non-violent offense suggests that there was a "limit" on the reasonableness of the use of force against her, where it is undisputed that she engaged in disruptive conduct in an incident during booking or detention. In the circumstances of this case, the proper factor is *Peters's conduct at the time that force was used against her*, not the severity (or insignificance) of the crime for which she was detained. *Compare Hicks*, 640 F.3d at 842; *Moore*, 146 F.3d at 536.

order, safety, or efficiency of the institution. *Hicks*, 640 F.3d at 842 (noting that the detainee "refused to comply with directions, loudly abused the correctional officers, and aggressively leapt toward [an officer]" in such a way that "it was reasonable for [the officer] to believe [the detainee] constituted a threat to [the officer's] safety"); *see also Moore*, 146 F.3d at 535 ("'Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest [or directions of the officers] are all relevant to the reasonableness of the officer's conduct.'" (quoting *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1081 (9th Cir. 1990))); *Johnson-El*, 878 F.2d at 1048 (explaining that the use of force against pretrial detainees "must be necessarily incident to administrative interests in safety, security and efficiency"). Yet, common sense—and precedent—suggests that conduct of a detainee that may make an officer's *decision to use force* in a particular incident "objectively reasonable" may *not* make the *amount of force* actually used by an officer in that incident "objectively reasonable." *See id.* (considering both prongs in the analysis of the "objective reasonableness" of the use of force).

For example, an officer probably could not reasonably shoot a detainee simply because the detainee refused to comply with orders to come out of his cell, although the officer might reasonably use significant non-lethal force to remove the detainee from his cell. *See Skinner v. Cunningham*, 430 F.3d 483, 488-89 (1st Cir. 2005) (concluding that officers used reasonable force during "cell extractions" to remove a state prisoner from his cell to put an end to disruptions and damage that he was causing, where officers sprayed the prisoner with a non-lethal skin irritant, pushed him to the ground, handcuffed him, and carried him out of the cell). Conversely, the Eighth Circuit Court of Appeals has held that a reasonable jury could find that officers had no reasonable basis to believe, at the time that jailers entered the cell and allegedly

beat a detainee, that force was needed to prevent the detainee from endangering himself or others, if the jury believed the detainee's testimony that he was simply sitting in his cell and not yelling or kicking the walls and doors at the time that jailers used force against him, although he had done so previously. *Thompson v. Zimmerman*, 350 F.3d 734, 735 (8th Cir. 2003). Indeed, no matter how little force was used or how little injury was inflicted, the use of force was not "objectively reasonable," if the use of force was merely "gratuitous." *See Chambers*, 641 F.3d at 907-08.

Here, the defendants argue that Peters refused to comply with a lawful and reasonable order to change into a jail jumpsuit in the presence of Officer Risdal, a female officer, making the decision to use force to remove her clothing reasonable and appropriate. Peters counters that her initial refusal to disrobe in front of Officer Risdal did not warrant throwing her on a concrete bunk, bashing her head into a concrete wall, and ripping off her clothes as she "screamed in pain." I note that Peters's argument goes to the reasonableness of *the amount of force* used to enforce the order, not to the reasonableness of *the decision to use force* to compel her compliance with the order.

The *conduct of the detainee* that may make a decision to use force "objectively reasonable" includes *the detainee's failure to comply with an officer's orders*. *See, e.g., Hicks*, 640 F.3d at 842 (in concluding that the use of force was "objectively reasonable," noting, *inter alia*, the detainee's refusal to comply with directions to change into a jail uniform); *Moore*, 146 F.3d at 536 (in concluding that the use of force was "objectively reasonable," noting, *inter alia*, that the detainee "refus[ed] to comply with commands"). Nevertheless, the directive or order that the detainee has refused to follow must be *of the sort* warranting a decision to use force to compel compliance.

Specifically, in *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993), a case involving a convicted prisoner and, hence, an Eighth Amendment standard for "excessive force" claims, the Eighth Circuit Court of Appeals rejected the argument that the use of

"summary force" to compel compliance with *any* direct order given by a jailer was necessary to maintain control of the institution and, therefore, constitutional. 12 F.3d at 758-59. In *Hickey*, a jailer used a stun gun to stun an inmate for refusing to sweep out his cell. *Id*. at 759. The court held that compelling a prisoner's compliance with legitimate prison or jail regulations was unquestionably permissible and that a requirement that inmates sweep out their cells was clearly a legitimate regulation. *Id*. Even so, the court in *Hickey* rejected the argument that these conclusions "translate[d] into a mandate to use summary physical force to compel compliance with all legitimate rules." *Id.*

In *Hickey*, the court explained,

> Our review of the law shows that summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy. *Whitley [v. Albers]*, 475 U.S. [ ] 312, 106 S.Ct. [ ] 1078 [(1986)] (riot and hostage situation); *Jasper v. Thalacker*, 999 F.2d 353 (8th Cir.1993) (direct attack on officer); *Porth v. Farrier*, 934 F.2d 154 (8th Cir.1991) (attack on officers from within a locked cell); *Stenzel v. Ellis*, 916 F.2d 423 (8th Cir.1990) (refusal to comply with security regulations); *Jones v. Mabry*, 723 F.2d 590 (8th Cir.1983) (escape attempt), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *Caldwell v. Moore*, 968 F.2d 595 (6th Cir.1992) (prolonged hysteria); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir.1988) (refusal to submit to strip searches for weapons and contraband); *Soto v. Dickey*, 744 F.2d 1260 (7th Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985) (refusal to be handcuffed when required for officers to safely enter a cell). A mutiny by groups of prisoners outside of their cells or outside of the prison walls has also justified summary actions which would otherwise have been unconstitutional. *Whitley*, 475 U.S. at 312, 106 S.Ct. at 1078; *Jones v. Mabry*, 723 F.2d at 590; *Ort v. White*, 813 F.2d 318 (11th Cir.1987).

> The common thread running through all of the cases is a concern for the safety of the institution and for those within its walls. We do not attempt to limit good faith applications of force where it is reasonably thought to be necessary to maintain the order and security of a penal institution, but summary force has yet to be ratified as the *de jure* method of discipline where security concerns are not immediately implicated. *See Ort*, 813 F.2d at 324 (force in response to provocative act which due to its timing does not implicate order and security of institution is likely retaliatory rather than a good faith effort to maintain order). We have not found, and hope never to find, a case upholding the use of this type of force on a nonviolent inmate to enforce a housekeeping order.
>
> We do not presume to tell the Pulaski County Jail how to ensure compliance with their internal housekeeping regulations, but *using a stun gun is not a constitutionally permissible option. We find, as a matter of law, that the use of a stun gun to enforce the order to sweep was both an exaggerated response to Hickey's misconduct* and a summary corporal punishment that violated Hickey's Eighth Amendment right to be free of cruel and unusual punishment.

*Hickey*, 12 F.3d at 749 (emphasis added).

Thus, *Hickey* teaches that the nature of the order or directive—specifically, whether it was an order going to the safety of the institution and the detainees—and the proportionality of the force used to enforce the order determine the constitutionality of the use of force, not simply the fact that the detainee refused to follow a legitimate order. The same is true of the use of force to compel a pretrial detainee to comply with an order. *See Johnson-El*, 878 F.2d at 1048 (explaining that the use of force against pretrial detainees "must be necessarily incident to administrative interests in safety, security and efficiency"). In the context of the use of force against a pretrial detainee, this conclusion is, again, entirely consistent with the Fourth Amendment "objective

reasonableness" analysis, which looks at "both [an officer's] decision to use force and the amount of force used . . . *under the circumst*ances." *Hicks*, 640 F.3d at 842 (emphasis added); *accord Chambers*, 641 F.3d at 905-06 (explaining that the question is whether an officer's conduct "is objectively unreasonable, given the facts and circumstances of the particular case" (internal quotation marks and citations omitted)); *Hayek*, 488 F.3d at 1054 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." (internal quotation marks and citations omitted)).

Here, there is no disagreement that Peters refused to comply with an order to remove her street clothes and to change into a jail jumpsuit in the presence of a female officer. Peters has failed to generate any genuine issues of material fact that this order was anything other than an order going to the safety of the institution and the detainees, including herself, and to the security and efficiency of the jail. *Cf. Hickey*, 12 F.3d at 749; *Johnson-El*, 878 F.2d at 1048. As I noted repeatedly, in relation to Peters's "violation of privacy rights" claim, notwithstanding the evidence identified by Peters purportedly showing the lack of *post*-incident follow-up required for a "suicidal" detainee, which Peters contends shows that the officers' supposed fears that she would harm herself were not the real reasons for the conduct of the officers, no reasonable juror could conclude that, *at the time of the use of force against Peters to compel her compliance with the order to remove her swimsuit*, that order was *not* because of a concern that Peters needed to be protected from *potentially* harming herself with the strings on her swimsuit. *Torgerson*, 643 F.3d at 1042-43 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (internal quotation marks and citations omitted). Peters has pointed to nothing in the record that undermines Officer Risdal's testimony that, where a detainee refuses to answer the "suicide" questions, the detainee must be *treated* as

posing a potential for self-harm, and that the detainee's street clothing must be removed in an officer's presence to minimize that potential. Nor has Peters pointed to anything in the record that undermines Officer Risdal's testimony that her belief that she was required to treat Peters as posing a risk of self-harm was the motivation for Officer Risdal's order for Peters to remove her street clothes in Officer Risdal's presence, or undermining the Defendant Officers' testimony that force was used to compel compliance with that order. Moreover, as I noted, above, Peters's argument concerning her "excessive force" claim goes to the reasonableness of *the amount of force* used to enforce the order, not to the reasonableness of *the decision to use force* to compel her compliance with the order. Thus, Peters has failed to generate genuine issues of material fact that the decision to use force to compel compliance with the order to remove her swimsuit was" objectively unreasonable."

Peters argues that the amount of force used to compel compliance with the order to remove her swimsuit was unreasonable, because the force used was exaggerated and caused disproportionate and unnecessary injury. *See Hickey*, 12 F.3d at 749. This argument raises the separate questions of the relevance to the determination of the "objective reasonableness" of the use of force of *the method or type of force used* and *the degree of injury caused*.

Eighth Circuit precedent demonstrates that a factor in the determination of the "objective reasonableness" of the amount of force used is *the particular method or type of force used*. For example, in *Hicks*, the detainee's "excessive force" claim arose from an officer's use of an "'arm-bar' maneuver," which was "a technique designed to throw [the detainee] off balance and to take him to the floor." 640 F.3d at 841. The magistrate judge hearing the case found that, in the course of booking a detainee, the detainee became disruptive and uncooperative, including refusing to change into a jail uniform, acting aggressively towards officers, and jumping up on a bench when the

officers ordered him to complete the "clothing exchanges". *Id*. at 840. The magistrate judge found that, "when [the detainee] jumped off the bench towards [the defendant officer,] it was reasonable for [the officer] to believe [the detainee] constituted a threat to his safety" and to respond by using the arm-bar maneuver to take the detainee down to the floor. *Id*. The appellate court affirmed the magistrate judge's conclusion that the officer's effort to subdue the detainee by using the "arm-bar maneuver" involved "a reasonable use of force." *Id*. at 842.

Here, it is undisputed that, after Peters loudly refused to change into a jail uniform in front of Officer Risdal and made what Sergeant Blanchard reasonably believed were aggressive actions toward Officer Risdal and himself, Sergeant Blanchard took Peters's right hand and turned it away from him, pushing or resulting in Peters falling face down onto two mattresses on the bunk in the holding cell. There is no dispute that Peters remained face down on the bunk thereafter. Officers Risdal and Hatfield then helped to restrain Peters in order to get her under control, and defendant Officer Carlos Lucero, who had entered the cell when he saw Sergeant Blanchard and Officer Hatfield quickly reenter the cell, also assisted in restraining Peters. These types of force or methods of controlling Peters are so similar to those found "objectively reasonable" in similar circumstances in *Hicks* that Peters has not generated genuine issues of material fact that the type of force or the method of applying force was "objectively unreasonable"; instead, as a matter of law, the amount of force used was "objectively reasonable."

I note that *Hicks* did not appear to involve subsequent circumstances like those in this case, in which Sergeant Blanchard applied a mandibular angle control measure with his right thumb below Peters's left ear when Peters continued to resist and to attempt to disobey the officers' directions. Nevertheless, Peters has not generated any genuine issues of material fact that this method of control of a detainee who continues to resist

and struggle is *per se* "objectively unreasonable." Rather, the Eighth Circuit Court of Appeals has held that more significant types of force were "objectively reasonable" in similar circumstances. *See Moore*, 146 F.3d at 535-36 (concluding that, in the circumstances, which included the detainee's continued struggling and attempting to get away, the application of a stun gun, taking the detainee to the floor, and holding him there were not "objectively unreasonable").

Where this case parts company with *Hicks* and *Moore* is with Peters's allegation that she was not only taken down, then restrained (including with the mandibular angle control measure), but that the *method or type of force used* included bashing her head repeatedly against hard surfaces, either the bunk or the cell wall. I explained, *supra*, in notes 1 and 8, that Peters failed to respond properly to the defendants' allegations, in Defendants' Joint Statement Of Undisputed Material Facts, ¶¶ 17 and 19, concerning the methods used to take down and retrain Peters, so that I deemed the defendants' allegations to be undisputed. Peters's allegation that her head was also "bashed" against hard surfaces is not inconsistent with the facts deemed admitted, but is an *additional* allegation, albeit one that should have been asserted in a statement of additional material facts pursuant to N.D. IA. L.R. 56(b)(3), which Peters failed to provide with her resistance to the defendants' Motions For Summary Judgment. In her resistance *brief*, Peters cited only her treating physician's evidence in support of her assertion that she was "bashed" against hard surfaces. The district court is under no obligation "to plumb the record in order to find a genuine issue of material fact" or to "speculate on which portion of the record" might support a non-movant's claim. *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (internal quotation marks and citations omitted). Nevertheless, in excerpts of Peters's deposition that the *defendants* provided, in their Appendix In Support Of Summary Judgment (docket no. 42-2), and for which I had to do no "plumbing" or "digging," Peters testified,

My head was bashed into the corner of the wall and where the bench meet several times. There wasn't anything that I could—I'm screaming. I'm not resisting. I'm not fighting you. And it didn't matter how much I wasn't resisting, it wasn't stopping.

* * *

Q.     Okay. And you are pointing to the left side above your eye?

A.     At one time this is where it—initially that is where I was being—my head was being bashed into.

Q.     And you said this happened several times?

A.     Yes. . . .

Defendants' Appendix at 88 (Peters's Deposition at 166:24-167:5, 169:17-24). In light of this testimony and the treating physician's evidence concerning injuries to Peters when she was treated shortly after the incident and his opinion that those injuries were "consistent with her head being hit or hit into something," Plaintiff's Appendix at 11-12, there are at least genuine issues of material fact that the method or type of force used was exaggerated. *See Hickey*, 12 F.3d at 749.

Peters relies on *the degree of injury that she suffered* as generating genuine issues of material fact that the amount of force used against her was "objectively unreasonable." The Eighth Circuit Court of Appeals has now made clear that the degree of injury suffered by the detainee is relevant to the "objective reasonableness" analysis of an "excessive force" claim, but that neither significant nor insignificant injury necessarily determines the "objective reasonableness" of the use of force. The court has explained, "While '[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used,' [the court has] reasoned, 'it is logically possible to prove an excessive use of *force* that caused only a *minor* injury.'" *Bishop v. Glazier*, 723 F.3d 957, 962 (8th Cir. 2013) (quoting *Chambers*, 641 at 906).

To put it another way, "[a]lthough a *de minimis* use of force is insufficient to support a claim, a *de minimis* injury does not necessarily foreclose a claim." *LaCross v. City of Duluth*, 713 F.3d 1155, 1158 (citing *Chambers*, 641 F.3d 906).

More specifically, in *Chambers*, the court held that the conduct of the officers—where one of the officers "repeatedly choked and kicked [the detainee] during the trip to the hospital, and [another officer] extended the journey by taking a roundabout route and intentionally driving so erratically that [the detainee] was jerked roughly back and forth in his car seat while his head was positioned adjacent to the dashboard"—was not "objectively reasonable," notwithstanding that such conduct did not cause significant injury, because the use of force was "gratuitous." 641 F.3d at 907-08. Thus, while the lack of significant injury might have suggested that the amount and type of force used also was not significant (and, therefore, not necessarily unreasonable), the detainee was still subjected to "excessive force," because "the decision to use force" was wholly unreasonable, where the use of force *at all* was "gratuitous."

In contrast, in *Hicks*, notwithstanding that a detainee sustained relatively significant injuries, the Eighth Circuit Court of Appeals concluded that both the decision to use force and the amount of force used were "objectively reasonable." 640 F.3d at 841-43. In *Hicks*, the magistrate found that, during the incident involving the use of force, "[the detainee] lost his footing and fell[,] hitting his mouth on the fingerprint table or the bench." *Id.* at 841. Also, there was apparently no dispute that "a dentist extracted a number of [the detainee's] teeth and trimmed the surrounding upper and lower bone." *Id.* at 841. Neither the use of force by the officer nor the resulting injuries to the detainee in *Hicks* could reasonably have been dismissed as *de minimis*. *See LaCross*, 713 F.3d at 1158 ("Although a *de minimis* use of force is insufficient to support a claim, a *de minimis* injury does not necessarily foreclose a claim." (citing *Chambers*, 641 F.3d 906)). Nevertheless, in *Hicks*, the appellate court

simply did not discuss the detainee's injuries in the part of its decision affirming a magistrate judge's conclusion that the officer's use of the arm-bar maneuver had not been "objectively unreasonable." 640 F.3d at 842-43. What the appellate court did discuss was whether the officer's decision to use force and whether the amount of force used, the arm-bar maneuver, were reasonable in light of the detainee's conduct. *Id.* Thus, the *degree of injury* does not necessarily correlate directly to whether the use of force was "objectively reasonable," but must be considered in the context of other circumstances.

Indeed, the Eighth Circuit Court of Appeals subsequently concluded just that in *Chambers*:

> *The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted.* Some plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people. A greater than *de minimis* injury requirement under the Fourth Amendment would mean that the same quantum of force, in the same circumstances, could be unconstitutional when applied to a citizen with a latent weakness and constitutional when applied to a hardier person. *The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force. See Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir.2002). *The rule should focus instead on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used. See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

*Chambers*, 641 F.3d at 906.

The court in *Chambers* concluded that the use of force was "objectively unreasonable," despite the lack of significant injury. *Id.* at 907-08. On the other hand, the court in *Hicks* concluded that the use of force was objectively reasonable, without

even mentioning the degree of injury, which was significant, in the "objective reasonableness" analysis. 640 F.3d at 842-43. The conclusion in *Hicks* is explainable, in light of the later decision in *Chambers*, because the detainee's injuries from the appropriate use of the arm-bar maneuver, although significant, were "unpredictable and fortuitous consequences of an officer's use of force." *See Chambers*. 641 F.3d at 907-08.

Here, where Peters *has* generated genuine issues of material fact that the method used to subdue her involved the officers repeatedly "bashing" her head against hard surfaces, and that she suffered injuries consistent with such "bashing," according to her treating physician, there is at least a genuine issues of material fact that the method of force was exaggerated and caused disproportionate and unnecessary injury. *See Hickey*, 12 F.3d at 749. To put it another way, there is a question for the jury to decide as to whether, on the one hand, as in *Hicks*, Peters's injuries from the fall onto the bunk, if any, and any bumping of her head against hard surfaces during subsequent efforts to restrain her while she struggled were only "unpredictable and fortuitous consequences" of the Defendant Officers' use of force, *see* 640 F.3d at 841, 842-43 (not mentioning the detainee's significant injuries in the analysis of the amount of force used); *Chambers*, 641 F.3d at 906 (explaining that the focus should be whether the force applied was "objectively reasonable" under the circumstances, not "unpredictable and fortuitous consequences of an officer's use of force"), or, on the other hand, the method of force used was exaggerated, and caused disproportionate and unnecessary injury, because it included "bashing" her head against hard surfaces. *Hickey*, 12 F.3d at 749.

This is true, even if Peters's injuries are considerably less significant than the injuries suffered by the detainee in *Hicks*, which were apparently considered an "unpredictable and fortuitous consequence" of the use of force against him. 640 F.3d

at 841, 842-43; *Chambers*, 641 F.3d at 906.  While "[t]he degree of injury should not be dispositive," either to grant or deny a claim of "excessive force," "because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted," *Chambers*, 641 F.3d at 906, Peters's injuries do suggest that the amount of force used against her *after* she was taken down was not "objectively reasonable," in part because the infliction of such injury, under the circumstances, could reasonably be deemed "gratuitous," if the jurors believe that Peters was not continuing to resist the officers.  *Id.* at 907-08 (holding that the use of force during transportation of the detainee to the hospital was merely "gratuitous," where the detainee did nothing during the trip to warrant the use of force).

Thus, viewing the factual record in the light most favorable to Peters, I conclude that the record supports a conclusion that the Defendant Officers violated Peters's constitutional rights.  *SL ex rel. Lenderman*, 725 F.3d at 850 (stating this standard for the first prong of the "qualified immunity" analysis).

### iii.    Summary

While I find that, as a matter of law, the decision to use force was "objectively reasonable," I conclude that there are jury questions on whether the amount of force used—specifically, the alleged "bashing" of Peters's head against hard surfaces—was "objectively reasonable," in light of all of the circumstances and relevant factors, *see Hicks*, 640 F.3d at 842, and in the light most favorable to Peters, *see SL ex rel. Lenderman*, 725 F.3d at 850.  Thus, I conclude that Peters has generated genuine issues of material fact that there was a violation of her right to be free from "excessive force," as required to survive the defendants' Motions For Summary Judgment on that claim on the first prong of the "qualified immunity" analysis.  *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3.  The defendants are not entitled to summary judgment on

Peters's "excessive force" claim on the ground that she cannot establish a violation of her rights.

### c.    *"Clearly established" right*

Because I conclude that Peters has generated genuine issues of material fact that her rights were violated, when force was used against her, on the first prong of the "qualified immunity" analysis of her "excessive force" claim, I must also consider whether, if there arguably was a violation of her right to be free from "excessive force," that right was "clearly established," as required to survive the second prong of the "qualified immunity" analysis. *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3. This prong of the analysis is also contested.

### i.    *Arguments of the parties*

The defendants argue that, while a right to be free from the use of "excessive force" is "clearly established," the right must be defined at the appropriate level of specificity to demonstrate that an officer could not have believed that his actions were justified.  They contend that an "objectively reasonable" officer in Officer Risdal's position could not have believed that she was using "excessive force" when Peters refused to change into jail clothing and that an" objectively reasonable" officer in Officer Hatfield's and Sergeant Blanchard's position could not have believed that they were using "excessive force" when they stepped into the cell to assist Officer Risdal. Similarly, the defendants argue, an "objectively reasonable" officer in Officer Lucero's case could not have believed that he was using "excessive force" when he went to assist his fellow officers in restraining an uncooperative detainee.  They argue that nothing points clearly or unmistakably to the unconstitutionality of the Defendant Officers' conduct.

In response, Peters argues that, at the time of her arrest and detention, the law was "clearly established" that requiring an arrestee to remove her clothing absent a

legitimate justification germane to jail safety or administration, and bashing a detainee's head against a concrete bunk and wall in the above-described circumstances to force such a disrobing constitutes unreasonable force. In support of this contention, she cites *Howard* and other cases, which, as the defendants point out in reply, recognize that a right to be free from the use of "excessive force" is "clearly established" in a general sense, but none of which involve the use of force against a pretrial detainee who refused to comply with a legitimate order.

ii.    *Analysis*

Again, the point of the "clearly established right" inquiry in the qualified immunity analysis is to determine "'if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff[s].'" *Scott*, 720 F.3d at 1036 (quoting *Gordon*, 454 F.3d at 862, with alterations omitted, emphasis in original, and citations and internal quotation marks omitted). Here, there are also genuine issues of material fact as to whether the Defendant Officers either knew or reasonably should have known that their actions would violate Peters's right to be free from "excessive force." *Id.*; *Bishop*, 723 F.3d at 961 (explaining that whether a constitutional right at issue was "clearly established" is a question of law for the court to decide).

Peters was not required to point to prior precedent as "clearly establishing" that the precise conduct of the Defendant Officers at issue would violate her general right to be free from "excessive force." *Winslow*, 696 F.3d at 738. Nevertheless, this was a case in which "[a] general constitutional rule already identified in the decisional law [applied] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," and a case in which "[t]he unlawfulness [of the officers' conduct was] apparent in light of preexisting law," putting the officials "on notice that their conduct violate[d] established law even in

novel factual circumstances." *See id.* (internal quotation marks and citations omitted).

Again, the decisions in *Hicks v. Norwood*, 640 F.3d 839 (8th Cir. 2011), and *Moore v. Novak*, 146 F.3d 531 (8th Cir. 1998), discussed in detail above, both of which antedate the conduct at issue in this case, would have led a reasonable jail officer to believe that it was "objectively reasonable" and permissible to use force to compel compliance with an order to change into jail clothing, as a legitimate order going to the safety and security of the jail, the officers, and the detainees, including Peters. Those decisions, however, would not have led a reasonable jail officer to believe that it was "objectively reasonable" and permissible to bash an unresisting detainee's head against hard surfaces as the type and amount of force appropriate to compel compliance with the order. Rather, if the jurors conclude, from the disputed evidence, that the officers "bashed" Peters's head against hard surfaces, particularly while she was not resisting, as the type of force used to restrain her, an issue on which I have concluded there are genuine issues of material fact, then the jurors could also conclude that the use of such force was "gratuitous," *see Chambers*, 641 F.3d at 907-08, and no officer could have believed that doing so would not violate Peters's right to be free from "excessive force."

Therefore, I conclude that, as a matter of law, the violative nature of the particular conduct of "bashing" an unresisting detainee's head against hard surfaces to compel compliance with an order to disrobe was "clearly established," *Bishop*, 723 F.3d at 961 (explaining that whether a constitutional right at issue was "clearly established" is a question of law for the court to decide), and the Defendant Officers are not entitled to qualified immunity on such a claim.

### d. *Summary*

I conclude that Peters has generated genuine issues of material fact that her rights were violated on her "excessive force" claim, and that the violative nature of the

particular conduct at issue in that claim—"bashing" her head against hard surfaces—was "clearly established." Application of the "qualified immunity" doctrine in this case is not appropriate, because it might shield the Defendant Officers from liability for the unreasonable use of force. The defendants are not entitled to summary judgment on Peters's "excessive force" claim on the basis of the qualified immunity of the Defendant Officers.

### 4. The "First Amendment retaliation" claim

In Count II of her Amended Complaint, Peters alleges violation of the right to freedom of speech and the right to petition the government guaranteed by the First Amendment to the United States Constitution and Article I, section 7, of the Iowa Constitution against all defendants. Peters alleges in this claim that "[t]he Defendants strip searched [her] in the unlawful manner identified above in violation of the Constitutions of the United States and the State of Iowa, and in violation of Iowa law, at least in part in retaliation for her exercising her First Amendment rights to freedom of speech, and/or for protesting her right to change clothes in private." Amended Complaint, Count II, ¶ 53. She also alleges that "[t]he Defendants refused to release [her] early from her jail sentence for earned, recommended and approved good time credit, and/or refused to give her credit for time previously served, in retaliation for her exercising her First Amendment rights to freedom of speech and to petition the government for redress of grievances, also in violation of Article I, Sections 7 and 20 of the Iowa Constitution." *Id*. at ¶ 54.

The defendants also seek summary judgment on this claim, in the first instance, on the basis of qualified immunity. Thus, as to this claim, as with the two claims discussed above, I must consider whether Peters has generated genuine issues of material fact that her First Amendment rights were violated and whether those rights were "clearly established." *See Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3.

### a.     Arguments of the parties

The defendants concede that a citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is "clearly established," citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). Thus, they contend that the only question here is whether a reasonable jury could find that they violated Peters's right to be free from retaliation for First Amendment activity when they purportedly strip-searched her[15] and purportedly denied her "good time" credit. The defendants contend that Peters's First Amendment retaliation claim fails, as to her complaints about the manner in which she was being treated prior to the forcible removal of her swimsuit, because that speech was not constitutionally protected activity, where it did not involve a matter of "public concern" or "an issue of public importance," but merely a "personal grievance" about the manner in which she was being treated. The defendants also contend that none of the Defendant Officers was involved in the decision to deny Peters early release. They contend that Sergeant Blanchard's only involvement with the determination that Peters was not entitled to "good time" credit was to notify her, in response to her inquiries, that she would not be receiving "good time" credit, after he called his superior to find out about the situation.

Peters responds that the Defendant Officers are not entitled to qualified immunity on this claim, because she was complaining about the official conduct of the Defendant Officers, and that statements revealing official impropriety usually involve matters of public concern. Turning to elements of her "First Amendment retaliation" claim that

---

[15] As I explained, *supra*, beginning at page 45, Peters was not "strip searched," even if she was "searched" in a technical sense within the meaning of the Fourth Amendment, when officers removed her street clothes (swimsuit) to eliminate the potential for self-harm.

the defendants did not initially put at issue, Peters also argues that the temporal proximity between her complaints about her treatment and the almost immediate forcible removal of her clothing at the very least raises genuine issues of material fact that the officers acted in retaliation for her speech. She argues that she has pointed to evidence suggesting that the Defendant Officers' conduct was retaliatory, consisting of evidence that the proffered reason for stripping her was false. Peters offers no argument in support of the part of her First Amendment retaliation claim alleging that the Defendant Officers retaliated against her complaints about their conduct by depriving her of "good time" credit, however.

In their reply, the defendants argue that Peters has apparently conceded that the part of her First Amendment retaliation claim based on denial of "good time" credit should be dismissed, because she failed to address that part of her claim in response to their Motions For Summary Judgment. The defendants contend that they have qualified immunity to the remainder of Peters's First Amendment retaliation claim, that is, the part based on the allegation that Peters was "strip searched" in retaliation for complaining about the officers' direction to remove her clothes in front of them. They argue that Peters made nothing like a formal prison grievance or judicial complaint that could be construed as protected speech. They also argue that Peters's motive plainly was not to raise an issue of public concern, but simply to resist the officers.

Replying to Peters's arguments concerning additional elements of her "First Amendment retaliation" claim, the defendants also contend that, if Peters is correct that enforcing an order that a detainee or inmate has refused to follow is "retaliatory," then every time a detainee argues with an officer about following the officer's orders, the detainee could argue that the use of force to compel compliance with the order was retaliatory, which they argue is absurd. The defendants argue that Peters has turned causation on its head, by arguing that forcible removal of her clothes was done in

retaliation for resisting an order to remove her clothes, because the purportedly adverse action was the subject of the purportedly protected speech, and the motivating factor for the Defendant Officers' actions was not Peters's speech, but her refusal to comply with the order.

### b. *Analysis*

As pleaded, Peters's "First Amendment retaliation" claim plainly had two distinct parts: (1) "strip-searching" her in retaliation for protesting about the violation of her right to change clothes in private, Amended Complaint, Count II, ¶ 53; and (2) denying her "good time" credit in retaliation for exercising her First Amendment rights to protest and to seek redress for grievances, *see id.* at ¶ 54. Although the defendants clearly moved for summary judgment on *both* parts of Peters's "First Amendment retaliation" claim, Peters only addressed the first part of her claim in her Resistance, as the summary of the arguments above indicates. Failure to respond *at all* to a movant's assertion that the movant is entitled to summary judgment on the undisputed facts is the clearest way in which a non-movant can fail to meet its burden to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586–87). As the Eighth Circuit Court of Appeals explained some time ago, where a non-movant fails to respond to a motion for summary judgment, the district court is under no obligation "to plumb the record in order to find a genuine issue of material fact" or to "speculate on which portion of the record" might support a non-movant's claim. *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (internal quotation marks and citations omitted). Therefore, I agree with the defendants that they are entitled to summary judgment on the part of Peters's "First Amendment retaliation" claim alleging denial of "good time" credit in retaliation for her exercising her First Amendment rights,

because Peters has conceded the inadequacy of the record to support that part of the claim.

I turn to the analysis of the defendants' motion for summary judgment on the part of Peters's "First Amendment retaliation" claim still at issue—that is, to which Peters has responded—the part of her claim alleging that she was "strip-searched" in retaliation for protesting about the violation of her right to change clothes in private. As the Eighth Circuit Court of Appeals has explained,

> To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [she] engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary firmness" from continuing in the activity, and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity."

*L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 807–08 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)); *see also Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (case involving a civilly committed sex offender, quoting *L.L. Nelson Enters.*, 673 F.3d at 807-08, for this standard); *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (citing these elements in a case involving a state convicted prisoner); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (citing similar elements in a case involving arrestees who alleged retaliatory arrest for exercising First Amendment rights).

The defendants' sole basis for summary judgment on the remaining part of Peters's "First Amendment retaliation" claim in their initial briefs was that Peters relies on speech not protected by the First Amendment, because that speech did not involve a matter of "public concern," merely a personal complaint about Peters's treatment. This argument is too clever by half. There is simply no decision of the Eighth Circuit Court of Appeals or the Supreme Court requiring that, to be "protected activity" within the

meaning of the first element of a "First Amendment retaliation" claim, a prisoner's or detainee's speech must be on a matter of "public concern." *See L.L. Nelson Enters.*, 673 F.3d at 807-08 (identifying the elements of a "First Amendment retaliation" claim). Indeed, the decision of the Eighth Circuit Court of Appeals in *Heritage Constructors, Inc. v. City of Greenwood, Ark.*, 545 F.3d 599 (8th Cir. 2008), demonstrates that there is no such requirement.

In *Heritage Constructors*, a company suing a city for retaliation under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, based on denial of a contract because the company exercised its right to petition by initiating arbitration on an earlier contract with the city, argued "that this circuit did not require the public concern test in several prisoner petition cases," so that it was not subject to a "public concern" requirement, either. 545 F.3d at 602. The Eighth Circuit Court of Appeals rejected this argument, although acknowledging that "prisoner cases" involving "First Amendment retaliation" do not require that the speech at issue be on a matter of "public concern," because "[t]he prisoner cases . . . are inapposite, as the governments were not acting in those cases as employers or contractors." *Id*. at 602. Similarly, the Seventh Circuit Court of Appeals has expressly held "that the public concern test developed in the public employment context has no application to prisoners' First Amendment claims, even in the case of speech by a prisoner-employee," so that the plaintiff prisoner in that case did not have to prove that his speech, criticizing a prison librarian's library policies, related to a matter of public concern, only that he engaged

in this speech in a manner consistent with legitimate penological interests. *Watkins v. Kaper*, 599 F.3d 791, 796 (7th Cir. 2010).[16]

Some circuits have simply not decided the question of whether or not a prisoner's speech must be on a matter of "public concern" to gain First Amendment protection. *See Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (noting that "whether the public-concern test determines the protection to be afforded a prisoner's speech is an open question in the Sixth Circuit"). Whatever the status in other circuits may be of a "public concern" requirement for First Amendment protection of prisoner's speech, the defendants have not cited, and I have not found, any controlling decision *requiring* that a prisoner's speech be on a matter of "public concern" to constitute protected First Amendment activity. *But see Robinson v. Boyd*, 276 Fed. App'x 909, 910 (11th Cir. 2008) (unpublished op.) (concluding that a prisoner's "First Amendment retaliation" claim failed, because the prisoner was "not speaking on a matter of public concern," so that "his speech is not entitled to First Amendment protection," but also holding that the prisoner did not have a First Amendment right to argue with an officer who gave him a direct instruction and that the officer was constitutionally permitted to discipline the prisoner for disobeying his order).[17]

---

[16] *See also Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) (concluding "that a prisoner's speech can be protected even when it does not involve a matter of public concern"); *and compare Pearson v. Welborn*, 471 F.3d 732, 740-41 (7th Cir. 2006) (concluding that a prisoner's speech about matters of "public concern" *would be* entitled to First Amendment protection, but not *requiring* that the speech be about matters of "public concern").

[17] Some Circuit Courts of Appeals have concluded that speech on a matter of "public concern" by a prisoner is relevant to a "First Amendment retaliation" claim involving *prison employment*. *See Sims v. Piazza*, 462 Fed. App'x 228, 233 (3d Cir.

(Footnote continued . . . )

The defendants' reliance on the decision in *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205 (D. Colo. 2008), is misplaced, because that decision is not controlling law in this circuit, and I conclude that it is not persuasive, because it imports a "public concern" requirement for First Amendment protection in a prisoner speech case, as if speech on a matter of "public concern" is a requirement for First Amendment protection of *any* speech. 552 F. Supp. at 1227. In doing so, the court relied on a decision that, in turn, cited *Connick v. Myers*, 461 U.S. 138 (1983). *Id.* The decision in *Connick*, however, imposed a "public concern" requirement only for First Amendment protection of speech *by a person in public employment*. *See* 461 U.S. at 147 (stating, "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior," but also explaining, "We do not suggest, however, that [a public employee's] speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment.").[18]

---

2012) (unpublished op.) (finding that termination of a prisoner's prison employment for reporting thefts and misuse of public funds to authorities satisfied any "public concern" requirement for protection of an employee's free speech rights); *McElroy v. Lopac*, 403 F.3d 855, 859 (7th Cir. 2005) (where a prisoner asked about "lay-in pay," when his prison employment was terminated, because the shop was being closed, he was not commenting on a matter of "public concern" that would warrant First Amendment protection in the prison employment context, but only on a personal matter). Peters's "First Amendment retaliation" claim does not involve retaliation for conduct during prison employment.

[18] I find it unnecessary to consider Peters's argument that her verbal complaints, at the time of the incident in which her swimsuit was forcibly removed, are analogous

(Footnote continued . . . )

The defendants are not entitled to summary judgment on Peters's remaining "First Amendment retaliation" claim on the basis that Peters's purportedly protected conduct did not involve a matter of "public concern," because there is no "public concern" requirement for prisoner speech to be protected by the First Amendment under controlling law, and, consequently, the defendants have sought summary judgment on the basis of an issue that is not material. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "the substantive law will identify which facts are material" for purposes of summary judgment).

The defendants have, however, asserted more meritorious arguments for summary judgment on this claim, albeit only in their reply in response to issues injected by Peters in her resistance. I ordinarily will not consider new arguments raised for the first time in a reply brief. *See, e.g., Syngenta Seeds, Inc. v. Bunge North America, Inc.*, 906 F. Supp. 2d 827, 832 (N.D. Iowa 2012); *Truckenmiller v. Burgess Health Ctr.*, 814 F. Supp. 2d 894, 907 n.3 (N.D. Iowa 2011) (citing *Armstrong v. American Pallet Leasing, Inc.*, 678 F. Supp. 2d 827, 872 n. 19 (N.D. Iowa 2009), N.D. Ia. L.R. 7.1(g), and practice in the Eighth Circuit). Nevertheless, the grounds asserted for the first time in the defendants' reply—at least those that I will address—were not technically "new," nor is my consideration of summary judgment on these grounds *sua sponte*, because those grounds were actually injected into consideration of summary judgment *by the non-movant*, Peters, in her response to the defendants' Motions For Summary Judgment. Even if my consideration of these grounds was *sua sponte*, however, my consideration of those grounds would not be improper, because "a

---

to the filing of a formal prison grievance or lawsuit, the protected conduct found in *Haynes v. Stephenson*, 588 F.3d 1152, 1155-56 (8th Cir. 2009), and, consequently, that her conduct was also entitled to First Amendment protection.

determination of summary judgment *sua sponte* in favor of the prevailing party is appropriate so long as the losing party has notice and an opportunity to respond." *Global Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839, 844 (8th Cir.2009); *Figg v. Russell*, 433 F.3d 593, 597 (8th Cir. 2006) ("*Sua sponte* orders of summary judgment will be upheld only when the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted.") (internal quotation marks omitted). Peters has had notice and a full opportunity to respond, where she raised the issues herself in her response; she did not seek leave to file a surreply to address the counterarguments of the defendants, in their replies, to the arguments that she had raised; the issues that I will address are legal ones; and no additional facts that might change the outcome could be adduced on those issues. *Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 594 F.3d 1055, 1061-62 (8th Cir. 2010) (holding that the district court did not improperly grant judgment on an issue not previously raised, because "[t]he issue of whether a legal duty exists is a question of law, the issue has been fully briefed and argued by the parties, appellants have not identified any additional facts they would present to the district court that could alter the outcome, and the district court properly found that no duty exists, and because "[a]ny remand would be futile and a waste of judicial resources.").

Specifically, I find that whether the forcible removal of Peters's clothes was in retaliation for any protected speech is a very close question. In the first instance, the purportedly protected speech consisted of complaints about the order to remove Peters's clothes, and the allegedly retaliatory conduct simply enforced that order. It is well-settled that simply enforcing an order that a detainee has refused to obey is not retaliation for the refusal to obey. *See Walker v. Bowersox*, 526 F.3d 1186, 1189-90 (8th Cir. 2008) (concluding that an inmate's claim that an officer's pepper-spraying him

to enforce an order to hand over a food tray was not retaliatory would fail as a matter of law, because the inmate admittedly ignored the officer's repeated orders to hand over the food tray, which could be used as a weapon); *Smith v. Erickson*, 961 F.2d 1387, 1388 (8th Cir. 1992) (*per curiam*); *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990) (*per curiam*). That is not the end of the matter, however, because, although I explained, above, that Peters has failed to show that the order to remove her clothing in front of a female officer was inappropriate, she has generated genuine issues of material fact that the force used to enforce the order was "excessive," because the amount of force used after she was "taken down" allegedly involved "bashing" her head against hard surfaces even though she was not resisting. Evidence that Peters was subjected to "excessive force" (specifically, the alleged "bashing" of her head into hard surfaces when she was not resisting) to compel compliance with the order might suggest to reasonable jurors that the officers' actions were retaliatory, not simply to enforce the order. *See, e.g., Stewart v. Lyles*, 66 F. App'x 18, 21-22 (7th Cir. 2003) (unpublished op.) (concluding that an inmate stated a retaliation claim, where he complained to an officer that "strip searching" inmates in front of all 130 inmates and several female supervisors in a tailoring shop was contrary to prison regulations, because the officer then singled out the inmate for a more invasive "cavity search"). Thus, Peters has generated genuine issues of material fact on her "retaliation" claim, but only to the extent that she has generated genuine issues of material fact on the "objective reasonableness" of the "amount of force" on her "excessive force" claim.

### c. Summary

Peters has not resisted summary judgment on that part of her "First Amendment retaliation" claim alleging denial of "good time" credit in retaliation for her exercising her First Amendment rights. As to the part of that claim alleging that the forcible removal of Peters's clothes was in retaliation for her complaints about the order to

remove her clothes, contrary to the defendants' contentions, there is no "public concern" requirement under controlling precedent for a prisoner's speech to be protected. Furthermore, this part of the claim survives summary judgment, even though it is well-settled that simply enforcing an order that a detainee has refused to obey is not retaliation for the refusal to obey, because Peters has generated genuine issues of material fact that the Defendant Officers did more than simply enforce the order, but, instead, used "excessive force" in doing so, by allegedly "bashing" her head against hard surfaces. Ultimately, Peters can only prevail on her "retaliation" claim if she first prevails on her "excessive force" claim. Nevertheless, the defendants are *not* entitled to summary judgment on the part of Peters's "First Amendment retaliation" claim alleging retaliation for complaining about removing her clothes in front of male and female officers.

### C.    Challenges To Claims Based On The Iowa Constitution

#### 1.    Arguments of the parties

The defendants have also moved for summary judgment on Peters's claims to the extent that they are based on the Iowa Constitution, because, they contend, Iowa statutes do not recognize a civil claim for damages based on an alleged violation of the Iowa Constitution. They contend that the legislature, not the courts, has the authority to create a cause of action to vindicate any rights secured by the Iowa Constitution, unless the Iowa Constitution itself specifically creates a right to damages. The defendants argue that the Iowa Constitution simply does not provide an implied cause of action for vindication of any of the rights at issue here.

Peters argues that her claims based on violations of the Iowa Constitution are valid, because those claims arise under the common law. She contends that her causes

of action based on violations of the Iowa Constitution are analogous to "*Bivens*" claims against federal actors for violation of the United States Constitution. In support of her argument, she points out that this court recognized an action for violation of the Iowa Constitution in *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 784-85 (N.D. Iowa 2007).

In their reply, the defendants do not reiterate their contention that Peters's claims of violations of the Iowa Constitution are invalid causes of action.

### 2. *Analysis*

Peters does not cite, and I still have not found, any decision of an Iowa court holding that a private cause of action may arise from a violation of the Iowa Constitution. Nevertheless, Chief Judge Linda R. Reade has concluded that the Iowa Supreme Court would likely recognize such an action, as an analogue to an action against federal actors for violations of the United States Constitution in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 784-85 (N.D. Iowa 2007). I agree with Chief Judge Reade's analysis and conclude that the defendants are not entitled to summary judgment on any claim for a violation of the Iowa Constitution, simply because such a claim purportedly is not valid.

Nevertheless, Peters has not asserted that there would be any analytical difference between her claims based on the Iowa Constitution and her claims based on the United States Constitution that would "save" her claims under the Iowa Constitution where I have granted summary judgment on the analogous claims under the United States Constitution. Therefore, because I have already granted summary judgment on Peters's claim of "violation of privacy rights" under the United States Constitution, the defendants are also entitled to summary judgment on the analogous claim under the Iowa Constitution. The defendants are not entitled to summary judgment on Peters's

claims under the Iowa Constitution based on the use of "excessive force" and "free speech retaliation."

### D. Challenges To "Monell Liability"

Finally, defendants Woodbury County and former Sheriff Glenn J. Parrett (the County Defendants) assert that they are not liable on any of Peters's claims based on "*Monell* liability," where they had no direct involvement in the incidents at issue. I must consider whether there is a basis for "*Monell* liability" of the County Defendants, where I have found that the Defendant Officers have qualified immunity to Peters's claims.

#### 1. Arguments of the parties

As to "*Monell* liability," the County Defendants argue that, because Peters has not suffered any constitutional injury on any of her claims, they cannot be held liable on those claims. Furthermore, they contend that Peters has not set forth sufficient evidence of any policy, custom, or practice of the County or the former Sheriff to establish "*Monell* liability." Specifically, they argue that Peters has not identified any policies of the County that authorize jail officers to violate a detainee's privacy rights, use "excessive force," or retaliate against an inmate for exercising his or her right to freedom of speech. Similarly, they argue that there is simply no evidence of a custom, pattern, or practice of violation of these rights.

Although Peters apparently concedes that there is no "policy" on which "*Monell* liability" on her claims could be based, she argues that "*Monell* liability" can be based on a pervasive "custom" or where a sheriff or similar official is aware of, and fails to remediate, unlawful actions of jail staff. She contends that it has become a custom at the Woodbury County Jail to give detainees unlawful orders, then to retaliate against them when they refuse to obey such orders; that the County Defendants were aware of

115

prior complaints about unlawful "strip searches" and related activity; and that, despite such knowledge, the County Defendants failed to discipline, supervise, or train officers at the Woodbury County Jail. Indeed, she argues that jail personnel persist in their belief that a detainee has no right to refuse to follow an order, even if the order is unlawful.

In reply, the County Defendants argue that Peters has cited no facts or evidentiary support for her contention that the jail officers would give detainees unlawful orders, then use "excessive force" or retaliate against them for refusing to obey such unlawful orders. They argue that the prior "strip search" cases before this court do not provide any notice of comparable unlawful conduct by jail staff, but even if they did, they are too few to amount to a "pattern" of unconstitutional conduct attributable to them. They also argue that there is simply no evidence of an unlawful order in Peters's case, let alone one that was the result of policy, custom, or practice.

### 2. *Analysis*

The Eighth Circuit Court of Appeals has succinctly described the requirements for "*Monell* liability" of a municipality, as follows:

> Although the Supreme Court has "held that a municipality is a 'person' that can be liable under § 1983," it is well established "that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir.2007) (citing *Monell [v. Department of Social Servs. of New York]*, 436 U.S. [658,] 690–91, 98 S.Ct. 2018 [(1978)]). Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; (2) an unofficial "custom," *id*. at 690–91, 98 S.Ct. 2018; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). Thus, in order to avoid summary judgment, the plaintiff must establish that "a reasonable jury could find that 'action pursuant to an official municipal policy of some nature caused a constitutional tort.'" *Id.* at 1207 (quoting *Monell*, 436 U.S. at 691).

However, the failure to allege (or establish or generate a genuine issue of material fact on) a single violation of rights by a municipal officer is fatal to a claim of *Monell* liability against the municipality. *Folkerts v. City of Waverly, Iowa*, 707 F.3d at 975, 983 (8th Cir. 2013); *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 470-71 (8th Cir. 2010); *accord Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). Where I have found that, as a matter of law, there was no violation by the Defendant Officers of Peters's rights on her claim of "violation of privacy rights," there can be no "*Monell* liability" for the County Defendants on that claim, either.

Even as to Peters's "excessive force" and "free speech retaliation" claims, on which I have found genuine issues of material fact as to violations of Peters's rights, Peters has failed to generate any genuine issues of material fact that the violation of her rights was the result of any policy, custom, or practice. *Atkinson*, 709 F.3d at 1214. Indeed, Peters nowhere addressed her "excessive force" claim in her response to the County Defendants' assertion that there was no "*Monell* liability" on any of her claims. She has also failed to point to evidence sufficient to establish any "custom" or "practice" of using "excessive force" to enforce an order in retaliation for a detainee's complaints about that order.

The County Defendants are entitled to summary judgment on all of Peters's claims, because there is no basis for "*Monell* liablity."

## IV.    CONCLUSION

Upon the foregoing, I will not grant Peters's Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II, to the extent of excluding Mr. Leach's testimony and report in their entirety.  I will grant that Motion, however, to the extent that I will limit Mr. Leach's trial testimony in the ways describe above. Also, Peters has dismissed Count IV of her Amended Complaint and certain of the defendants, and, in response to the defendants' Motions For Summary Judgment, she has failed to generate genuine issues of material fact on her "violation of privacy rights" claim against the remaining defendants.  Consequently, I will grant both of the defendants' Motions For Summary Judgment on that claim.  Although I will deny the Defendant Officers' Motion For Summary Judgment as to Peters's "excessive force" and "free speech retaliation" claims, I will grant the County Defendants' Motion For Summary Judgment on those claims, because Peters has not generated any genuine issues of material fact on the issue of their "*Monell* liability" for those claims.

THEREFORE.

1.    The plaintiff's July 1, 2013, Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II (docket no. 39) is **granted in part and denied in part**, as follows:

    a.    To the extent that the Motion seeks to exclude Mr. Leach's testimony and report in their entirety, it is **denied**; but

    b.    To the extent that the Motion seeks to limit Mr. Leach's trial testimony, it is **granted**, and Mr. Leach's trial testimony will be limited in the ways described herein.

2.    The Defendant Officers' July 8, 2013, Motion For Summary Judgment (docket no. 42) is **granted** as to Peters's "violation of privacy rights," but **denied** as to Peters's "excessive force" and "free speech retaliation" claims;

3.     The County Defendants' July 8, 2013, Motion For Summary Judgment (docket no. 44) is **granted in its entirety**.

This case will proceed to trial only on Peters's "excessive force" claim and Peters's "free speech retaliation" claim, but only against the Defendant Officers.  On the record presented here, Peters can prevail on her "free speech retaliation" claim only if she first prevails on her "excessive force" claim.

**IT IS SO ORDERED**.

**DATED** this 25th day of October, 2013.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA